659 So.2d 738 (1994)
Steven R. DRURY
v.
AMERICAN HONDA MOTOR COMPANY, INC., et al.
No. 93 CA 1414.
Court of Appeal of Louisiana, First Circuit.
December 22, 1994.
Rehearing Denied March 21, 1995.
Writ Denied June 23, 1995.
Byard Edwards, Jr., Ponchatoula, Randell L. Champagne, Baton Rouge, for appellees.
Lawrence J. Duplass, Metairie, for appellant.
Before CRAIN, FOIL and WHIPPLE, JJ.
CRAIN, Judge.
After a unanimous jury verdict in favor of defendant in a products liability action, the trial judge granted a JNOV and alternatively *739 a new trial in favor of plaintiff. Defendant, American Honda Company, Inc., has appealed.
Steven Drury, John Schliegelmeyer and two female companions had spent the night of October 24, 1981, at a campground near Chipola in St. Helena Parish, where Drury and Schliegelmeyer had intended to spend the weekend riding their three-wheel all terrain vehicles (ATVs). Because of heavy rain that night, on the following morning Drury and Schliegelmeyer determined that the grounds were too muddy to do much riding; thus, Drury and his party decided to return home. After packing their camping gear, Drury and Schliegelmeyer decided to race their three-wheelers from their campsite to the highway. They started out side by side but shortly after the start, Schliegelmeyer got into the lead position. Drury attempted to catch up with the lead vehicle. Exactly what happened next and why it happened was highly contested. However, Drury eventually collided with the rear of Schliegelmeyer's ATV. Drury ended up on the ground with his ATV on top of him. Schliegelmeyer helped Drury get up. Thereafter, Drury drove his ATV to the pickup truck and Schliegelmeyer helped Drury load it onto the truck. Drury allegedly suffered personal injuries as a result of this accident.
Drury instituted this action in products liability against the American Honda Motor Corporation, Inc. (American Honda), as the manufacturer and/or distributor of the 1981 Honda ATC 250-R, which Drury both owned and drove at the time of the accident, and Covington Cycles, Inc., the seller of the ATV. At the time of trial on the merits American Honda was the sole remaining defendant. After a nine day trial on the merits, the jury reached a verdict after less than one hour of deliberation. In response to the first jury interrogatory, "Was the Honda ATC defective, i.e., unreasonably dangerous in foreseeable use at the time of plaintiff's accident?" the jury unanimously responded "No." The trial judge rendered a judgment in conformity with the verdict. Plaintiff filed a motion for judgment notwithstanding the verdict (JNOV) and subsequently filed an amended motion for JNOV and an alternative motion for new trial. After a hearing on the matter, the trial judge granted the JNOV and alternatively, a new trial. In conformity with granting the JNOV, the trial court awarded to plaintiff the sum of $2,174,114.41. Plaintiff was apportioned with 331/3% fault and the award was reduced accordingly. From this judgment, Honda appeals alleging as error: (1) the granting of the JNOV; (2) the award of damages despite the fact that plaintiff failed to prove the 250-R was defective or that the complained of injuries were related to the accident, and alternatively, quantum; and (3) the alternative granting of a new trial.

THE JNOV
The JNOV is provided for in La.C.C.P. art. 1811. The criteria for granting the JNOV were set forth by the Supreme Court in Anderson v. New Orleans Public Service, 583 So.2d 829 (La.1991). The court therein stated that:
"A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fairminded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied.... In making this determination, the court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party."
Anderson, 583 So.2d at 832.
On review, the appellate court must first determine if the trial court was in error in granting the JNOV. In making this decision, the appellate court uses the same criteria as did the trial judge in granting the motion. Id.

*740 CONSUMER PRODUCT SAFETY HISTORY OF THE ATV

ATVs were first imported into the United States in the 1970's. The term ATV generically describes the three and four wheel vehicles which were extremely popular in the 1980's. There were several ATV manufacturers. Those manufactured by Honda are called ATCs, which is a Honda brand name. The ATC 250-R was the most powerful and the best performing ATC manufactured by Honda at the time of its introduction into the market in 1981.
In 1984 the Consumer Product Safety Commission (CPSC) expressed concern about the dramatic increase in injuries associated with ATVs and expressed its concern to Tetsuo Chino, the president of American Honda Motor Co. By letter dated March 21, 1984, the CPSC cited statistics of injuries associated with ATVs: 2,948 injuries in 1979; 4,929 injuries in 1980; 6,008 injuries in 1981; 8,585 injuries in 1982; and 27,554 injuries in 1983. The numbers for 1982 and 1983 represented a 220 percent increase. The sources of the statistics cited in the letter were the CPSC Directorate for Epidemiology and the National Electronic Injury Surveillance System (NEISS). By letter dated August 15, 1984, to Mr. Chino from the CPSC, Honda was notified that for the first half of 1984 there were 30,000 such injuries.
Pursuant to the Consumer Product Safety Act, the CPSC was authorized to take regulatory action and use its enforcement powers to protect the public from products deemed to present an unreasonable hazard or unreasonable risk of injury to the public. On May 31, 1985, the CPSC published an Advance Notice of Proposed Rulemaking (ANPR) in the Federal Register pursuant to the Consumer Product Safety Act and the Federal Hazardous Substances Act to address the risks of injury associated with ATVs. Regulatory as well as non-regulatory alternatives were discussed in the ANPR. Additionally, the public was invited to comment on the issue.
The CPSC also began a formal investigation of risks associated with ATVs. This investigation was conducted by the ATV Task Force which was established by the CPSC on April 3, 1985, and was comprised of CPSC staff representing a broad range of disciplines in order to include examination of economic, epidemiologic, engineering, human factors and medical aspects of ATV safety. The purpose of the Task Force was to investigate the hazards associated with ATVs and to make recommendations. The action plan included: (1) conducting investigative surveys of ATV related injuries and consumer exposure in order to obtain detailed information on ATVs; (2) conducting engineering, human factors, and medical analyses of the hazards associated with ATVs and their use; (3) monitoring development of voluntary industry standards; (4) sharing compiled information with ATV user groups and government officials; (5) monitoring the education and training effort; and (6) conducting public hearings to obtain safety-related information on ATVs.
A hearing was held before a Subcommittee of the Committee on Government Operations of the House of Representatives on the ATV issue and the response of the CPSC to the issue. Prior to the publication of the ATV Task Force Report, on July 16, 1986, the Committee on Government Operations published its Fortieth Report entitled Consumer Product Safety Commission's Response to Hazards of Three-Wheel All-Terrain Vehicles [ATV's]. The report provided in part:

"III. FINDINGS
(1) The committee finds that the use of ATV's presents both an unreasonable and an imminent risk of death and serious injury requiring immediate enforcement action by the Consumer Product Safety Commission. An adequate data base has long since existed for making this determination.
(2) The committee finds that Congress has provided the CPSC with ample emergency authority to eliminate from the market-place on an expedited basis, unreasonably hazardous consumer products. By failing to use these special powers to prevent continuing deaths and injuries related to ATV use, the CPSC has failed in its responsibility to protect the public.

*741 (3) The committee finds that ATV's present an imminent and unreasonable risk of death, serious illness or severe personal injury under section 12 of the Consumer Product Safety Act.
a) The committee's finding of an `unreasonable' risk is based on a balancing of the likelihood and severity of the injuries that may result from ATV use against the harm such a finding imposes upon manufacturers and consumers. This balancing includes consideration of the following:
(i) Number and severity of injuries and deaths: Injuries and deaths associated with ATV use are unacceptably high. Injuries and deaths attributable to ATV use already exceed the toll attributable to any product known to have been banned or recalled through Federal regulatory agency action.
(ii) Distribution of injuries by age groups: A significant number of ATV injuries occur among children who are unable to adequately protect themselves from the hazard.
(iii) Analysis of number of deaths and injuries and severity of injuries as compared to similar products: ATV-related injuries and injuries deaths, in absolute and relative terms, exceed those attributable to similar products such as motorcycles or snowmobiles.
(iv) Information concerning the utility of the product: ATV's are used primarily for recreational purposes.
(v) Engineering and technical data: Because of their stable appearance, many users are deceived into believing that ATV's may be driven safely by users of all ages and skill levels. In fact, the vehicle's unique handling characteristics require substantial skill, strength and coordination to operate safely.
(vi) Human factors: Even experienced riders who have not engaged in rider misuse are often the victims of fatalities and serious injuries.
(vii) State laws: State laws are inadequate to deal with the problem.
(viii) Voluntary action: Voluntary training programs and voluntary standard development by manufacturers of ATV's have been exceedingly slow and inadequate to deal with the risks of ATV use.
(b) The committee's finding of an `imminent' risk is based on a review of numerous accident reports and other data demonstrating that loss of control of the vehicle leading to death or serious injury can manifest itself virtually at any time and occurs regularly regardless of whether rider misuse is involved or not. It is also based on the absence of any demonstrated correlation between significant driver misuse and injury from vehicle use.
(4) The committee finds that ATV's constitute a substantial product hazard under section 15 of the CPSA. This finding is based on the large and increasing number of ATV incidents involving serious injuries and deaths; the large and increasing number of products in use; the fact that all of the products present the potential for serious injury or death; the fact that overturning and loss of control are found in a majority of investigations regardless of possible rider misuse and regardless of the experience of the rider; and the inability or unwillingness of users to understand or heed warnings and instructions accompanying the product in many cases.
(a) The committee finds that ATV's present one or more of the following types of patterns of defects (any one, combination, or all of which could present a substantial product hazard): A design defect based on inherent instability; a defect based on failure to adequately instruct the rider in the use, operation and maintenance of the vehicles; and defects relating to specific components of the vehicles.
(b) In determining whether the risk of injury presented by ATV's is the type of risk which render these vehicles defective, the committee finds as follows: ATV's are used primarily for recreational use; therefore, the utility and benefits afforded to the general public by their use are limited. In contrast with the limited benefits, the nature of the risk of injury is severe, including paralysis and death. The risk of injury is substantial in both absolute and comparative terms, and is increasing at an *742 alarming rate as the estimated number and use of ATV's increase. The populations at risk are primarily children and young adults. Children may not have sufficient motor skills or ability to understand or appreciate the hazards and risk of injury presented by the ATV's. Young adults may not be likely to appreciate these concerns either. It is also questionable whether the user population in general would follow warnings relating to these concerns, or instructions for use of the vehicles.
(5) The committee finds that the steps already taken by the CPSC, the ATV-manufacturers and the States to deal with the ATV-safety problems have not yet and will not soon result in timely remedial actions to prevent continued deaths and injuries related to ATV use."
The Committee recommended to:
"A. The Consumer Product Safety Commission
(1) At a minimum, the CPSC should act immediately under section 3(e)(2) of the Federal Hazardous Substances Act (FHSA) with respect to ATV's intended for use by children, to promulgate a rule declaring all such ATV's to present an imminent hazard to the public health and thus declared to be banned hazardous substances.
(2) The committee believes, however, and thus recommends that a more acceptable and comprehensive public policy approach is to recall all three-wheeled vehicles. Accordingly, the CPSC should immediately take action under section 12 or 15 of the Consumer Product Safety Act (CPSA) to seek a recall of all ATV's, with costs to be borne by the manufacturers of such vehicles, and to seek such other remedies as provided for in those sections.
(3) With respect to future production of ATV's and in order to insure the safety of ATV's sold hereafter, the CPSC should establish a deadline of August 1, 1986, to issue a proposed safety rule to deal with the hazards associated with ATV use. If the Commission finds that no feasible safety standard would adequately protect the public, it should promulgate a rule under section 8 of the CPSA declaring ATV's to be a banned hazardous product.
II. In the event the CPSC fails to act immediately, the committee recommends to:
B. Manufacturers of ATV's
(4) Manufacturers should immediately halt current production and sale of ATV's.
(5) Manufacturers should immediately contact every existing ATV owner to apprise them of the rising accident and fatality rate and the risks of ATV use, especially to children; and should inform ATV owners of explicit safety precautions to be undertaken. In addition, manufacturers should make training courses available to all current owners of ATV's.
(6) Manufacturers should immediately develop a voluntary standard to eliminate or adequately reduce the risk of injury associated with ATV's. Such a standard should incorporate the age and training recommendations set forth in paragraph 11 below. It should also deal with ATV performance characteristics such as dynamic stability and handling.
(7) Manufacturers should include safety equipment (such as a protective helmet) in the price of ATV's unless proof of ownership of a helmet is presented.
(8) Manufacturers should stress the need for safe riding practices in their ATV advertisements. They should eliminate advertisements showing dangerous practices.
(9) In order to eliminate ATV use by children, manufacturers should permanently cease producing small-sized vehicles for use by children.
(10) Manufacturers should utilize rotating warning labels (akin to the schedule currently utilized for health warnings in cigarette advertising) on all ATV advertising material in print, audio or telecast media. Such warnings should also be included in all ATV owner manuals. These warnings should deal with use by children under age 14; the danger of tipping over upon encountering obstacles, slopes, or during turns; the fact that ATV's require special riding skills; it should warn against *743 use by more than one person; and should advise that riders should complete training courses before riding and should always wear a helmet, boots, gloves, and other protective gear."
Id. at 13-16. Dissenting views of committee members were also published in the report.
Upon completion of its assignment, the ATV Task Force compiled a Report of the CPSC All-Terrain Vehicle (ATV) Task Force: Regulatory Options for All-Terrain Vehicles which was presented to the CPSC on September 30, 1986. The Task Force found generally that:
"Accidents involve interactions among riders, ATVs, and the environment. While the staff believes that many of these accidents are the result of foreseeable misuse by ATV operators, there are two separate, identifiable ways in which rider characteristics can affect the chance of accidents. First, some riders may be less able than others to handle ATVs in normal driving situations, so that accidents are more likely. The Commission's Directorate of Engineering Sciences (ES) has determined that handling characteristics of ATVs, more particularly three-wheeled models, are unique and complex. Second, some riders may take greater risks than others, so that, again, accidents become more likely. ATV characteristics can interact with each of these rider patterns, and the nature of the interaction will depend on the environment."
Id. at 7.
Contained in the Task Force Report was the finding by the CPSC Human Factors staff that some operators are less able than others to physically and mentally control ATVs: body size, motor abilities, cognitive and perceptual abilities as well as adequate maturity and judgment should be sufficiently developed in children, pre-adolescents and teenagers for safe ATV operation. The staff also found that the risk-taking propensities of individual operators can affect accident probability, and there was evidence of a relationship between poor judgment among adult operators and ATV injuries. Examples of poor judgment exhibited by operators included carrying passengers, operating an ATV after consuming alcohol or using drugs, operating an ATV at excessive rates of speed, operating an ATV on paved surfaces, and the decision by ATV operators not to wear protective equipment or clothing. The strongest pattern reflected in the data is that young males take more risks than other operators and are more prone to operate the ATV beyond the margin of the operator's ability to handle it, e.g. a 20 year old experienced male operator on a three-wheel 200 ATV has an accident probability of 3.6%, a 40 year old male, 2.2%, and a 20 year old female, 1.4%.
The major findings of the Task Force are as follows:
"1. Typically, children under twelve (12) years of age are unable to operate any size ATV safely. This is because they lack adequate physical size and strength, cognitive abilities, motor skills and perception.
2. Children under sixteen (16) years of age are at greater risk of injury and death than adults when operating adult-size ATVs. This is due to poor judgment and failure to recognize and operate ATVs within their skill levels.
3. The risk of injury declines significantly with ATV riding experience.
4. Thirty percent (30%) of all fatal ATV accidents were associated with alcohol use. Fourteen percent (14%) of all reported accidents with injuries referenced alcohol consumption by the operator.
5. Thirty-one percent (31%) of the ATVs involved in accidents were carrying passengers.
6. Well-constructed, well-fitted helmets could substantially reduce the number of fatal head injuries to ATV operators.
7. Seventy-four percent (74%) of three-wheeled ATV accidents involved tipping or overturning compared to fifty-nine percent (59%) for four-wheeled ATV accidents.
8. The dynamic stability of four-wheeled ATVs is better than that of three-wheeled ATVs.
9. The handling performance of an ATV is strongly influenced by its suspension system; a properly tuned mechanical suspension for front and rear wheels is *744 better than front-only or tire-only suspended ATVs.
10. The majority of state governments have no laws regulating the use of ATVs. Where these laws do exist, they are not uniform from state to state.
11. The current draft industry voluntary standard is inadequate in addressing the risks of injuries related to ATVs."
Id. at 1-2.
The Task Force recommendations were to:
"1. Request the ATV industry to voluntarily cease marketing ATVs intended for use by children under the age of twelve (12). If unsuccessful, the Commission should then move to ban All Terrain Vehicles from the marketplace that are intended for use by children under the age of twelve (12).
2. Issue a Notice of Proposed Rulemaking for a warning label standard for the current ATVs intended for use by children under the age of fourteen (14). This standard would require labeling stating that these ATVs are not recommended for use by children under twelve (12) because of their lack of maturity and good judgment.
3. Issue a Notice of Proposed Rulemaking for a warning label standard for adult-size ATVs. This standard would require labeling stating that these ATVS are not recommended for use by children under sixteen (16) because they are at a greater risk of injury and death than adults due to deficiencies in judgment and failure to recognize and operate within their skill levels.
4. Issue a Notice of Proposed Rulemaking for a warning label standard for ATVs. This standard would require labeling stating that ATVs have unique handling qualities and that "hands-on" training of the operator is necessary to reduce the risk of injury and death.
5. Disseminate to the public the comparative safety information developed by the ATV Task Force. This information would describe the relative safety among ATV models.
6. Direct the Commission staff to carry out technical work necessary to support issuance of one or more Notice(s) of Proposed Rulemaking to address the performance characteristics of adult-size ATVs.
7. Intervene in the development of the ATV voluntary standard by formally requesting that CPSC staff comments be incorporated into the first phase of the voluntary standard.
8. Direct the Commission staff to fully participate in the development of performance requirements for the second phase of the voluntary standard.
9. Direct the Commission staff to develop a strong information and education campaign in Fiscal Year 1987. The I & E campaign would focus on the facts that: children should only operate ATVs intended for them and not adult-size ATVs; ATV operator training is a necessity; ATVs are to be ridden by one person only; and wearing a helmet while riding an ATV saves lives.
10. Direct the Commission staff to develop point-of-sale information in cooperation with the ATV industry. Topics included in this information would be: minimum ATV operator age recommendations, the need for ATV operator training, the need to wear helmets while riding ATVs, the unique handling qualities of ATVs, and the differences between risks associated with ATVs used for recreation and those for utility purposes.
11. Direct the Commission staff to work with the states and other Federal agencies to encourage the development of practical, technically sound and uniform state legislation and appropriate Federal regulations for operation of ATVs on public lands...."
At a closed meeting of the CPSC on December 12, 1986, the CPSC authorized an enforcement action pursuant to Section 12 of the Consumer Product Safety Act against all manufacturers of ATVs to have them declared an imminently hazardous consumer product. It further requested that the Justice Department seek to have defendants provide extensive notice and warnings to past, present and future consumers; provide *745 free hands-on training for future purchasers, and appropriate training for past purchasers; provide a refund program for ATVs used by a child under 16 years of age; and provide a refund program for three-wheel ATVs. The "Record of Implementation" of that meeting provided in part: "Based on all of the ATV information before the Commission, the Commission has reason to believe that ATVs present an imminent and unreasonable risk of death, serious illness or severe personal injury within the meaning of Section 12 of the Consumer Product Safety Act (CPSA)."
Pursuant to this authorization, the United States Department of Justice filed a complaint against the manufacturers in Federal District Court. The government complained that although ATVs appear benign, they are unique and complex, requiring a high degree of skill and constant attentiveness for safe operation and these factors result in a high risk of injuries to users, particularly those who are inexperienced and young. The government claimed that the ATV industry failed to adequately warn potential ATV users about the hazards presented by the ATVs. They were advertised as "family fun vehicles" posing little danger to their operators; safety information is not adequately imparted through their marketing; the labeling is inadequate; and there is insufficient promoting of the industry's operator training course thus resulting in under-utilization of the course by a significant number of ATV purchasers.
On April 28, 1988, the parties entered into a final consent decree. Pursuant to the decree the manufacturers agreed to: (1) stop the sale of new three-wheel ATVs to retail dealers, agents or representatives and repurchase from the retail dealers all three-ATVs which had not yet been sold to consumers; (2) represent affirmatively through advertisements and retail dealer representations the minimum ages for operating ATVs (a minimum age of 12 for operating ATVs with engine sizes of 70 through 90 cc and a minimum age of 16 for operating engine sizes above 90 cc); (3) affix warning and notice labels regarding age recommendations, no passengers, tire pressure and overloading, and mail labels to past purchasers; and (4) evaluate the efficacy of warnings and labels. Owner's manual supplements were to be supplied to past purchasers and dealers. New manuals were to be provided for future ATV models. The manual supplements were to contain agreed upon warning statements such as:
"YOUR ATV CAN BE HAZARDOUS TO OPERATE. A collision or rollover can occur quickly, even during routine maneuvers such as turning and driving on hills or over obstacles, if you fail to take proper precautions.
For your safety, understand and follow all the warnings contained in this Manual Supplement as well as those contained in the Owner's Manual and the labels on your vehicle. Failure to follow these warnings can result in SEVERE INJURY OR DEATH.

Other warnings were:
1) against operating an ATV without proper instruction. The driver was warned that the risk of an accident is greatly increased if the operator does not know how to operate the ATV properly in different situations. The operator was then advised that if he was a beginning or inexperienced operator he should complete the certified training course offered by the manufacturer.
2) against the risk of operating an ATV without wearing a protective helmet, gear and clothing.
3) against the potential hazard of operating an ATV at excessive speeds because doing so increases the operator's chances of losing control of the ATV, which can result in an accident. This hazard could be avoided by operating it at a speed that is proper for the terrain, visibility, operating condition, and experience.
4) against attempting wheelies, jumps and other stunts. These actions increase the chance of an accident, including an overturn.
5) against attempting stunts or trying to show off.
6) against failing to use extra care when operating an ATV on unfamiliar terrain. This can result in coming upon an object *746 without enough time to react thus causing the ATV to overturn or go out of control.
7) against failing to use extra care when operating on excessively rough, slippery or loose terrain which could cause loss of traction or vehicle control, which could result in an accident, including an overturn. In order to avoid this hazard, operators were advised to avoid operating an ATV on excessively rough, slippery or loose terrain until the operator has learned and practiced the skills necessary to control the ATV on such terrain.
8) against improper turning because the ATV could go out of control, which could cause a collision or overturn. In order to avoid the hazard the operator was advised to follow proper procedures for turning as described in the Owner's Manual; to practice turning at low speed before attempting to turn at faster speeds; and to avoid turning at excessive speeds.
9) against skidding or sliding improperly which could cause loss of control of the ATV, resulting in possible unexpected regaining of traction and overturning of the ATV. The operator was advised to learn to safely control skidding or sliding by practicing at low speeds and on level, smooth terrain.
Additionally, the manufacturers agreed to furnish safety videos and safety materials to dealers for dissemination; all media and marketing was to stress safe operation of ATVs; and a nationwide training program on rider training, safety awareness and communication was to be implemented.
In Volume 56, Number 181, pages 47166-47173, of the Federal Register of September 18, 1991, the CPSC published a notice to terminate rulemaking regarding risks associated with ATVs. Among the stated reasons for termination of the rulemaking proceeding were:
"The currently available information does not show that there are any modifications to the design of currently-produced four-wheel ATVs that would reduce injuries and deaths. Therefore, a product standard that would adequately reduce deaths and injuries from ATVs is not feasible at this time. The Commission also has concluded that an overall ban of ATVs is not appropriate because a large portion of ATV use is for nonrecreational purposes, because ATVs provide significant recreational value, and because there are no close substitutes for the product."
56 Fed.Reg. 47166-47167 (1991). The CPSC concluded that the necessity for additional action was no longer required. This was due in part to the halt in the distribution of three-wheel ATVs, the labeling of ATVs with warnings, the recommendation that children under age 16 should not ride ATVs with engines over 90 cubic centimeters, the placement of safety posters in dealerships, the offering of safety videos, the offering of a free rider training course to ATV purchasers and their immediate families, the running of prime time commercials and the inclusion of safety messages in all advertising and promotional materials as prescribed in the final consent decree. Additionally, four-wheel ATVs have a higher degree of lateral stability than three-wheel ATVs.
The primary remaining concern of the CPSC was the number of children below age 16 who continue to be involved in ATV accidents. The CPSC stated it would continue to monitor the industry for compliance with the consent decree and the decree's effectiveness in preventing children under age 16 from riding adult-size ATVs and the effectiveness of the rider training programs.
In the notice to terminate rulemaking, the CPSC also addressed that part of the consent decree which required the industry to develop standards for lateral stability. Although the industry terminated its efforts to develop a dynamic standard, the CPSC was satisfied that the remainder of the agreement would remain in effect. Lateral stability was defined as the degree to which an ATV resists sideways rollovers. The CPSC staff had initially sought a set lateral stability coefficient (Kst). Kst is a calculated relationship of the effective track width of the ATV to the height of its center of gravity. Id. at 47169. The CPSC and distributors agreed to address lateral stability as follows: (1) the ATV industry would set a voluntary standard of Kst for lateral stability for four-wheelers where the three-wheelers would remain *747 banned from the market place pursuant to the consent decree; (2) each manufacturer agreed not to manufacture any future ATV with a Kst less than the lowest in the company's 1988 models; and (3) within 18 months, the distributors would attempt to develop a dynamic standard for lateral stability which would be acceptable to the CPSC (for three-wheel ATVs, primarily). The industry concluded that it would be unable to develop such a standard; thus, the above agreement remained in effect.
The CPSC found the agreement on lateral stability acceptable because:
"1. The fact that three-wheel ATVs (which had Kst of only up to 0.67) would no longer be manufactured meant that only the more stable four-wheel ATVs will be sold to purchasers of new ATVs. This partially satisfied the concern that motivated the staff's original proposal for a Kst of 1.0.
2. The lowest Kst in production in 1988 was 0.89.... It appeared that in the future the typical ATV would have a Kst value approaching 1.0.
3. The Commission would still be free to issue a rule to require different or more stringent lateral stability requirements if additional data were obtained showing that such requirements could further reduce injuries and deaths."
Id.
The CPSC stated that its staff investigated the ATV-related deaths in 1989 to determine their cause. Of the 163 reported deaths 131 were related to the actions of the operator, e.g., driving under the influence of alcohol, or driving on public roads, carrying passengers. Sixty-five per cent occurred when the ATV was driven across or on a road, and lateral stability was thought to have contributed to 11 of the accidents. ATV riders occasionally:
"explore the performance limits of themselves and their vehicles, for example, by going around corners or across terrain as fast as they perceive is possible.... These factors would not be addressed by changes in product performance standards. Therefore, as long as ATVs are available for consumer use, there will be a certain irreducible level of incidents, no matter what standards are developed for ATVS."
Id. at 47170.
The CPSC discussed its statutory authority to address ATV risks and why it was not proceeding any further against the industry. Among the regulatory options available to the CPSC to address ATV risks were to: (1) issue consumer product safety standards; (2) declare the product banned as a hazardous product; (3) file an action in federal court to have a product declared to be an imminently hazardous consumer product; (4) determine after a hearing that ATVs present a substantial product hazard and if appropriate, order the remedies of public notice and repair or replacement of the product or refund of its purchase price; (5) issue a rule to require the manufacturers to provide the CPSC and consumers with performance and technical data related to performance and safety; and (6) declare ATVs intended for use by children to be a hazardous substance because they present a mechanical hazard. The CPSC stated that it had already filed an action in federal district court (option 3), and the consent decree which was previously discussed, provided for a comprehensive program for warnings, instructions, and rider training; thus, options 4 and 5 were not necessary. A prerequisite to proceeding with options one, two and six is that the CPSC establish that there is an unreasonable risk of injury associated with the product. The standard is whether the risk can be eliminated or reduced at a reasonable cost.
In considering its various options for future action, the CPSC considered the further development of performance standards for ATVs, i.e., lateral stability, engine size, vehicle weight or speed capability and auxiliary protective devices. The CPSC stated that it could not determine whether an increase of Kst to values above those in available ATVs should be required. Staff review of the 1989 death and injury data revealed that very few injuries and deaths would have potentially been prevented by increases of Kst. One hundred thirty-one of the one hundred sixty-three deaths were attributed to operator behavior. Lateral stability was the major cause of three of the accidents. Because of *748 its inability to demonstrate that increases in Kst would decrease the injuries and deaths, the CPSC could not establish that the benefits of a standard requiring increased Kst would bear a reasonable relationship to its costs. Although the statistics showed that the higher the vehicle weight the lower the risk, that statistical correlation may have been due to other factors associated with the weight of ATVs, including rider behavior and how ATVs are used (recreation v. utility).
A reduction in speed capability to the point that would clearly reduce injuries would reduce the utility of the machine. Apparently, there was no available reliable information on the speeds involved in ATV accidents. "Rollover and other modes of loss of control can occur at low speeds. Although high speed operation may be associated with increased risk, examination of vehicle performance characteristics and the injury data does not suggest a safe speed." Id. at 47172. The same considerations are applicable for reduced engine size and power.
"The utility of the vehicle is highly influenced by its power. Further, there is no suggestion of an appropriate maximum level of power. Very different power characteristics may be obtained from engines of the same size, depending on tuning, gearing and other aspects of design. The reported injury and death incidents include a wide range of engine sizes and horsepower ratings."
Id. The CPSC was unable to estimate the magnitude of injury reduction which might result from limiting vehicle speed capability, engine size and power or the resulting adverse effect on the utility and enjoyment of the vehicles warranted by the reduction. Thus, it could not establish that the benefits bear a reasonable relationship to the costs. There was also no available data to support a conclusion that roll cages, roll bars and restraint systems would prevent numerous injuries and accidents, nor was there available data to determine how many injuries would be caused by new hazards introduced by these devices.
A ban on the sale of all new ATVs was deemed inappropriate because:
"a large portion of ATVs are used for nonrecreational purposes, because ATVs provide consumers with substantial recreational value, and because there are no close substitutes for the product. Although a four-wheel ATV can be viewed as a close substitute for a three-wheel ATV, there is no close substitute for ATVs in general.
About half of all ATVs are used at least part of the time for nonrecreational purposes, and about 30 percent of all ATV use is for such purposes. ATVs also provide substantial recreational value. Numerous ATV users oppose any ban or recall of ATVs. The enthusiasm of ATV riders is shown also by the existence of clubs and magazines devoted to the sport. After considering these facts, the Commission concluded that taking actions to ensure that potential purchasers of ATVs are informed of the risks involved and that the riders of ATVs are informed about the actions that can be taken to reduce those risks is preferable to a ban. The warnings, instructions, and training required by the consent decrees are intended to accomplish these goals."
Id.
It was additionally stated that the available evidence did not establish that there was an unreasonable risk associated with new four-wheel ATVs being sold at that time. Nor was there reason to believe that new information would be forthcoming that the four-wheel ATVs create an unreasonable risk of injury. The CPSC concluded that a proposed rule to ban the sale of all new ATVs was not in the public interest. The possible banning of the sale of all new adult-sized ATVs for use by children under 16 years of age was also considered, and it was not determined that such a ban would be any more effective in preventing injuries in children under 16 than the age requirements in the consent decree. With regard to the last alternative, that of ordering replacements or refunds, the CPSC stated that, for the same reasons it would not order a ban on the sale of four-wheel ATVs, it would not order their replacement or refunds.

*749 "Although it might be easier to show that three-wheel ATVs contain a defect, the Commission cannot at this time conclude that an order for refunds of three-wheel ATVs would be in the public interest.
Under the consent decrees, new three-wheel ATVs have not been sold since 1987. Despite the fact that safety concerns about three-wheel ATVs have been well publicized, there is an active market for used three-wheel ATVs. Owners of three-wheel ATVs who want to sell them can do so on the used market. Thus, a refund may have little or no effect in removing three-wheel ATVs from the market."
Id. at 47173.
The CPSC further noted that a refund order generally results in protracted litigation. Given the projected life span of the three-wheel ATVs which remain in the hands of consumers and the projected length of litigation, there would be relatively few three-wheelers in the hands of consumers at the conclusion of litigation. It concluded, "[e]ven if finally achieved, the Commission sees no point in pursuing a such [sic] remedy when it would have little or no beneficial effect on the safety of ATV riders." Id.

TESTIMONY
It is uncontroverted that Drury owned three ATVs prior to his purchase of the Honda ATC 250-R; a Honda 90, Honda 110 and a Yamaha 125. He was an experienced rider, having "mud raced" the 110 at the Mud Hole in LaPlace and "flat track" raced the 125 at local events. His use of ATVs was primarily recreational. Drury purchased the 1981 Honda ATC 250-R used, from Covington Cycles, Inc. approximately one month before the accident. From the time of the purchase to the time of the accident the 250-R ran fine and exhibited no mechanical or handling problems.

A) PLAINTIFF

1) Steven Drury
Plaintiff testified on direct examination that he purchased the 250-R in response to the advertisements and dealer claims that it was very fast, had a powerful engine, and was a high performance vehicle; he never received warnings or operating or safety instructions from either American Honda or the dealership; he never raced the 250-R prior to the accident of October 25, he only rode it around his yard a few times; he never rode an ATV, including the 250-R, after the accident; and he was not involved in an ATV accident before the accident at issue.
On direct examination Drury described the events leading up to the accident. He stated that he and Schliegelmeyer decided to race their ATVs across the muddy ground to the highway. Schliegelmeyer soon passed plaintiff and was in the lead with plaintiff trailing 30 to 40 feet directly behind. Drury then stated:
"A.... I shifted mine out, John was in front of me, the next thing I know, mine opened up wide open, I couldn't stop it. And the next thing I recall, I'm, you know, done lost control. And John was in front of me. I tried to turn, to keep from hitting John. It wasn't no avoiding. And I hit John in theif I am not mistaken, in the back rightright-hand side.
Q. Did you lose control of the three-wheeler you were on? Did you lose control of it?
A. When it opened up and I couldn't slow it down, I panicked trying to stop it with the brakes, and it wasand it went wide open.
Q. You said you tried to turn to miss John Schliegelmeyer?
A. Uh-huh (affirmatively).
Q. At what point did you lose control?
A. When I couldn't stop it. In other words, when I seen [sic] that the throttle stuck or whatever, or whatever happened, it was wide open and thethe keythe you got thumb throttles on it and you got a kill switch up here, but it's so quick and so fast the front wheel will come off the ground. When it took off, it took off at whatever broke on the inside opened the bike up. I was in about second, second gear at the time. Like I described before, it is very fast and we wasn't probably, from where we was leaving to hit the *750 gravel, probably wasn't no further than from here to the front street from where we was making our turn.
....
A. JohnJohn wasn't aware of what was going on because the 250-R, if I am I had my expansion chamber on, which the expansion chamber is something that keeps it quiet. I think John had his on. But if you don't have them on, they [sic] just like chain saws. Loud, loud, loud. And I wasn't wearing a helmet, John wasn't wearing a helmet. And at that time I seen I was going to hit John. I done everything I could to keep from avoiding to hit him, but there was no way. When I turned, my back wheels caught his back wheels and started, you know, started flipping.
Q. I see. You flipped into his vehicle?
A. Yes.
....
Q. Mr. Drury, would you tell us exactly what happened from the time that you started to avoid Mr. Schliegelmeyer's motorcycle?
....
A. When John took off and I took off, John was in front of me. JohnJohn took off pretty fast. I took off, you know, pretty fast. I'm not talking about we both lined up going to see would [sic] could [sic] get to the gate first. We both took off. John was out in front of me. When I shifted mine, either firsteither second or third gear, something broke on the inside, my bike opened up wide open, the front wheel come [sic] up off the ground, I was trying to get the bike back into control, it was going so fast, itI got nervous with it, I couldn't stop the bike, I hit the brakes, I seen [sic] that I was going to hit John, and II tried to turn to keep from hitting John, and the bikethe bike started flipping. I couldn't stop it.
Q. Did it start flipping before you hit Mr. Schliegelmeyer?
A. Yes."
On cross-examination, which took place several days after plaintiffs initial testimony on direct, plaintiff was queried regarding conflicting testimony given at his May, 1983, deposition. At that deposition plaintiff stated that he could not recall and that he could not remember whether plaintiff's ATV touched Schliegelmeyer's ATV, nor did he know why the vehicle flipped over or what caused it to flip over. Plaintiff explained that his memory was better at trial than at the time of the deposition, because at the time the deposition was taken, plaintiff was having problems with his injured knee and was in pain, and he may have been on pain medication at the time of the deposition. He stated:
"Later down the line, throughout the years, John [Schliegelmeyer] and I have talked about this accident and, I mean, the more thatthat I read up on it, the more it brings back memories to me. So it's hard towhen they give you a deposition, ask you a question and you not that familiar on remembering on what happened that far away. It's hard for me to remember what happened last month, much less, you know, three years later. When WhenIf I go in and say John and I never hit until my bike went out of control, when I rolled over and hit, that is when we collided. I mean, these depositions can go on and go on and go on and go on. The onliest [sic] thing I'm going to try to tell y'all [sic], the truth the best I can. I'm not going to try to lie to y'all, to nobody, in no means."
Plaintiff also denied that he and Schliegelmeyer were racing to the highway; they were just riding; however, he made statements to the contrary at the May, 1983, deposition. After further cross-examination, he admitted that they were trying to outrun each other; as he tried to catch Schliegelmeyer, plaintiff's throttle "stuck open;" when plaintiff saw that he couldn't stop his ATV, he quickly turned the handlebar and front wheel to the right which caused his right rear tire to raise and the vehicle to start rolling over. He stated that he could not remember whether he hit the brakes to avoid rear-ending Schliegelmeyer, *751 nor did he remember telling another witness, Randy Nelson, that he did not hit the brakes. He also did not push the throttle "wide open" because "[i]f you opened it wide open and let off the clutch it's going to rare up on you. No, I don't think I opened it up wide open. When I went to shift it again, something broke, the bike opened up wide open, and I couldn't control it." He was approximately 10 feet from the lead vehicle when he realized that he wasn't going to be able to avoid striking the lead vehicle and attempted the sudden turn which, he alleges, caused the vehicle to rollover or flip.
On cross-examination, he remembered he had driven his 250-R about 50 times before the accident (from 2-7 hours per day); he did "wheelies" on his 250-R because it was "hard not to," despite the fact that he didn't like doing "wheelies" and sometimes he "popped wheelies" because it was part of his riding habit to do so.
Plaintiff testified on direct examination that either before or after the accident, plaintiff's sister purchased a Yamaha 175 ATV. She asked plaintiff to pick it up for her and ride it home. He agreed to do so. Unfortunately, the dealer mistakenly titled the 175 ATV in plaintiff's name rather than in that of his sister. He rode it home and later rode it around the yard a few times just to show his sister that it is "very, very dangerous, to watch how to turn, how you had to lean to turn. You know, they would turn over on you." On cross-examination, plaintiff was reminded that although he never owned the Yamaha 175, it remained titled in his name and he subsequently sold it to someone for $500. Plaintiff then remembered that he had purchased the 175 from his sister for $200 and sold it that same day to a third party for $500. He also remembered that his sister had purchased the 175 approximately in 1981, and he sold it to a third party in 1989. He admitted to cranking and riding the 175 because he was trying to sell it. He said that he cranked it with his right foot, depending on how bad his leg was hurting. However, during this time he had been unable to crank the 250-F because it was too hard to crank with his painful right leg.
He rode his 250-R at home after the accident, though it was hard to do. He sold it to his cousin two months after the accident, but he took it back because his cousin was tearing it up. Later, during cross-examination he remembered that he had not sold his 250-R until 1986, 1987 or 1989. Despite owning it all that time, he did not ride it during that period. Upon being reminded that in his May, 1983, deposition he was asked, "Do you still ride it?" and he answered "a little bit," plaintiff remembered that he went out and cranked it occasionally to keep it running. On direct examination, plaintiff testified that he had never ridden a 250-R prior to purchasing his own 250-R. On cross-examination, he remembered that he had ridden Schliegelmeyer's 250-R one time before purchasing his own. He explained that the reason his memory was better several days after his direct examination:
"I'm taking medication and [it's] hard for me to remember a lot of things, too, and then after I sit back and I read and I go back, Ibringit brings back memories."

2) John Schliegelmeyer
John Schliegelmeyer testified that on the day of the accident he was riding his own 250-R which he had modified for racing. Prior to the accident, he and plaintiff often raced and "horsed around" on their ATVs, Schliegelmeyer on his 250-R and plaintiff on one of his three ATVs; and when plaintiff raced, he raced to win. He stated then on October 17, 1981, the week before the accident, Schliegelmeyer, plaintiff and two of their girlfriends were riding their 250-R ATCs in a sand pit near Amite. Plaintiff's date was driving and apparently turned too short. Plaintiff, a passenger on his ATV, put his right foot down for stability, his leg "got hung" under the rear tire and it pulled him off of the ATV. Plaintiff "got the bike off of him and said he hurt his knee, but after a little while he said he would be all right."
Schliegelmeyer testified that at the time of the accident his first indication of a problem was when he felt the impact of plaintiff's vehicle into the rear of his vehicle. He then turned around and saw the left side of plaintiff's vehicle over the back of Schliegelmeyer's *752 vehicle, with plaintiff lying to the right side of his vehicle. He estimated that both he and plaintiff were traveling between 20 and 30 miles per hour immediately prior to the accident. Immediately after the accident, Schliegelmeyer helped get the ATV off plaintiff. When they again started to ride their ATVs towards the road, plaintiff said that he couldn't ride his any more. Plaintiff drove his ATV over to the truck where Schliegelmeyer helped plaintiff load it onto the truck. At that time he observed no visible damage, other than maybe a little paint scratch, to either his or to plaintiff's vehicle. Schliegelmeyer then drove his ATV to the highway.
Schliegelmeyer stated that he usually performed all the maintenance and repair on plaintiff's other ATVs; however, he never worked on plaintiff's 250-R. When queried, "At any time after this accident, I'm including the day of the accident, getting the bikes straight, taking them over, riding them to the truck, loading the truck, going home, and any time after that, did Mr. Drury ever tell you that the throttle stuck on that vehicle," the witness responded, "No, sir." He also stated that at the time of the accident they were "showing off for the girls."

3) Franklin Johnson
Franklin Johnson, accepted by the court as an expert "on the design and performance and defects and dangerous tendencies of ATV's, particularly as it applies to the situation with Mr. Drury and to all ATV's in general, as it relates to stability and other out of control defects with the vehicle," testified on behalf of plaintiff. Mr. Johnson stated that the 250-R is basically a racing machine and that all ATVs, three and four-wheelers, have a lateral instability problem. Three-wheelers in particular have a small geometric wheel base and a high center of gravity. The light weight of the vehicle coupled with the additional weight of the driver contribute to the high center of gravity. This makes the vehicle overturn sideways very easily. He testified:
"These characteristics are quantifiable ... By that I mean if you understand the location of the center of gravity and you understand how wide the vehicle is and how long it is, there are calculations that you can make that will give you an indication, not a prediction, but at least an indication of how stable the vehicle is. You can do this with an automobile, you can do it with ATV's. In any event, that calculation results in a number which is referred to as a stability index.
. . . .
We find that three-wheel vehicles, and Mr. Drury's would fall within this curve here (indicating), have a stability index around.55 or .61. His is about .6. Whereas four-wheel ATV's are a little bit more stable in turn. And usually some four-wheel vehicles get up to around .97. And I show you this table just to show you that these sorts of things can be examined by engineers and they can be examined by other people, consultants, manufacturers, whoever, when one designs a vehicle like this."
An additional problem is caused by the solid rear axle, which unlike that of a car, is not responsive to the movement of the handlebar and front tire. It is similar to that of a tricycle where the front wheel turns in response to the movement of the handlebar while the rear wheels continue to push the vehicle straight ahead. Due to the high center of gravity and the low weight of the ATV, the driver's weight becomes a vital part of controlling the vehicle during turning maneuvers. Thus, the driver must shift his weight during the turning maneuver. The speed of the turn determines the direction in which the driver's weight must be shifted. When turning, if the rider doesn't have time to lean, or leans in the wrong direction, there is an insufficient margin of safety built into three-wheel ATVs to compensate for those errors, and the vehicle will overturn.
Johnson said that he was not familiar with the safety tests performed by the manufacturer on the 1981 250-R. However, the studies by Honda on the predecessors of the 1981 250-R were not safety related; they were only performance related. Honda did not have a safety department or any such function within its company, and safety evaluation of such a unique product is a moral requirement. Honda should have conducted *753 performance, as well as crash tests in different environments to determine how and why the vehicle could get out of control with different types of operators and in different situations.
Johnson's recollection of conversations with plaintiff regarding the accident are that plaintiff did not attempt to apply the brakes near the time of the collision, and the accident occurred at a curve or turn in the path.
His reconstruction of the accident is as follows: as plaintiff accelerated his ATV, the throttle jammed. Realizing that a crash was imminent, he turned abruptly to the right in order to avoid colliding with the lead vehicle. Plaintiff's vehicle immediately pitched and rolled to the left; his left pant leg caught on the left foot peg or pedal; plaintiff's ATV collided with the lead vehicle. Plaintiff came to rest on the ground, his left pant leg caught on the left foot peg, while the front wheel of his ATV rested on the rear of Schliegelmeyer's vehicle.
In Johnson's opinion, several design defects of the ATV were responsible for causing the accident: the throttle which jammed in the "wide open" position which caused plaintiff to proceed with an emergency or abrupt maneuver; the lateral instability which resulted in the propensity of the vehicle to pitch roll; and the protruding foot peg.
In Johnson's opinion, the owner's manual provided insufficient warnings of the dangerous propensities of the vehicle and the warnings contained therein were of minimal value. His idea of a proper warning was similar to that placed by the U-Haul rental corporation on ATVs which it rented to customers. The U-Haul warning appeared with a skull and crossbones insignia and warned riders to study the user's guide; wear a helmet and goggles for protection; use foot pegs to avoid rear tires from running over feet; avoid engine pipes which burn skin; and keep the vehicle level when hauling it to avoid gasoline leaks. It also included the warnings "ATC's corner strangelysee user's guide" and "ATC's flip every which way-see user's guide."
On cross-examination he stated that plaintiff was an experienced rider and acknowledged that although three-wheelers may be defective in design, the nature of the defect may not always be the cause of an accident. Sometimes the operator or the environment are to blame. He gave as an example, the comparison between Corvettes and station wagons. Although Corvettes have a lower center of gravity than station wagons, Corvettes have a higher rate of turnover than station wagons. These turnovers usually occur off-road after the vehicle has left the environment of intended use. The veering off-road is usually attributable to operator error. ATVs are intended for off-road use, and the high center of gravity coupled with the off-road environment was not taken into account in designing the ATV.
He admitted that based on the physical evidence, there was no way that he could determine whether the throttle or its component part either played a role, or was a cause of the accident, because the throttle mechanism was not present when he examined the vehicle. He also admitted that when deposed prior to trial, he did not enumerate the foot peg as a design defect which contributed to the accident. He claimed that his reason for not doing so was because he was not specifically asked whether the foot peg was defective. Additionally, Johnson was not familiar with the CPSC final study of ATVs.

4) Randall Allen Nelson
Randall Allen Nelson, accepted by the court as an expert in handling ATVs, testified at trial on behalf of plaintiff. Some of Mr. Nelson's experience in handling ATVs include participating in studies of the stability problems of ATVs under controlled conditions. He also has over 2,000 hours of ATV operating experience and manufactured parts for ATVs including a suspension component for the 250-R. He stressed that ATVs present unique problems to a rider in making quick turns which are done in emergency or avoidance situations, the type of maneuver which plaintiff allegedly attempted just prior to the accident. The quick turn is also used in stunt riding where the rider balances on the front and one rear wheel.
Nelson explained that when performing a normal or slow turn, the driver must allow the rear tire on the inside of the turn to slip *754 against the ground. The rear wheels tend to push the vehicle in a straightforward direction; thus, the resistance of the front tire must overcome the traction of the inside tire (which is pushing straight ahead) so that the vehicle will turn. The driver accomplishes this by supporting his weight on the outside foot peg and balancing inward. He described the quick turn as follows:
"A.... In a quick turn it's required that the operator move in advance of the turn because if he waits and turns quickly, the vehicle will start to roll so quickly that you can't get your weight over the inside wheel to stop the roll. Now, you can stop the roll by aborting the turn, go ahead and turn back to the left, that'll allow the rear wheel to go down. But in an avoidance maneuver what happens is now you're you have sacrificed directional control for balance. You're driving into what you're trying to miss to keep the vehicle upright.
Q. In effect does this requirement go counter to the normal way to turn an ATC?
A. It goes counter in that generally on quick turns you don't support your weight on your left foot peg. That's counter.
Q. You are going to lean into a turn?
A. Yes. And it's counter that now you're dropping your weight and using it totally as ballast on the inside, generally trying to have both rear wheels slip rather than just the inside rear wheel. And
Q. Is itis it generally required that a person has specialized training to know how to perform this maneuver? At least be aware of how to do it and when to do it?
A. Yes. Yes. There's no information on this in instructional material that was available in 1981...."
Nelson stated that the 250-R was marketed as a racing, high performance vehicle; the advertisements for the 250-R contained no warnings about turning maneuvers; they only warned about wearing helmets and eye protection; the owner's manual for the 1981 250-R contained no information or instructions on performing the quick turn; the operator should be informed of the lateral instability of the particular ATV, i.e., "how quickly this vehicle can turn over and how the vehicle may react entirely differently over various terrain situations," and that its turning mechanism differs from most vehicles that we are commonly associated with; the operator should be warned that it is "imperative that the operator ballast the machine, that the stability of the machine itself is not sufficient to keep the vehicle upright[.] [a]nd that the operator has to try to stabilize the machine with his weight. Throwing it to the inside;" and even though a rider has had experience in operating a 250-R or other ATV, he may never have had experience in performing a quick turn maneuver. Using the wrong technique in this situation would result in the machine going into a pitch-roll as occurred in the accident at issue.
On cross examination, Nelson agreed that ATV accidents can occur by operator error or rider fault; he has been involved in a few ATV accidents in which he was injured; and he was at fault in several of those accidents. When queried whether he had any evidence that the throttle on Drury's ATV had malfunctioned, he responded "If you're looking for physical evidence, obviously I don't. I never saw the throttle. I don't know if anybody ever observed it."
Nelson testified on rebuttal that in his years of experience in repairing ATVs, he has viewed thousands of carburetor springs; depending on the type of assembly, he has seen damaged and broken springs; the 250-R has two springs; and a broken carburetor spring can cause the throttle to stick. Additional reasons for a stuck throttle are dirt, debris, misrouting of the cable, kinking of the cable and a worn cable.
In Nelson's opinion, the only option available to plaintiff to avoid the collision was to make a quick turn, as previously discussed; plaintiff's accident was caused by the quick turn and lateral instability, not by plaintiff's "rear-ending" the lead ATV. If the front wheel of a trailing ATV contacts a rear wheel of the leading ATV, the front wheel of the trailing ATV will stop and the trailing ATV will do a front flip, which did not occur in this accident. Nelson also stated that he has seen many three-wheeler crashes and pitch rolls. In some cases the riders sustained *755 many injuries, in others they did not. He was asked on cross examination whether he has ever made the statement that a broken carburetor spring would probably still work. Nelson answered "Well it would work certainly, but it wouldn't return." He admitted that depending on the location of the fracture, "it won't go any faster than it was originally pushed or go any further than it was originally pushed. It just doesn't return. It will stay there or sluggishly go back down to its idle position." He also admitted that he had never done any testing on carburetor springs. He was queried regarding the many ATV crashes he has seen:
"Q. All right. I want to make sure I understand you correctly. You have seen off-road vehicles like three-wheelers, four-wheelersI want to make sure I understand what you told the Jury. You have seen a situation where a vehicle's riding along that weighs approximately this size, 350 pounds or so, 30 miles an hour or so, a rider on the vehicle, it starts to roll, goes over on its side, the man stays on; the man's body, his head, his shoulders are on the ground, the vehicle keeps going. Now, this is not like the video of the four-wheeler where the child flew off to the right clear. We're not talking about that. We're talking about this situation where the man stays with the vehicle, the vehicle starts to roll to the left, he hangs on, the vehicle rolls over on top of him; his head, his shoulders, his neck, the entire body is underneath; according to Mr. Edwards, his feet are sticking up in the air, he's riding it just like a horse; he comes over again, he's still on top, then he goes over again and goes back and somehow collides and lands up on top of Mr. Schliegelmeyer's vehicle. Now, you're telling this Jury that you saw a situation like that and the rider walked way?
A. Well, I'd have to say, first of all, I am not sure that I have seen the rider stay on through two revolutions
Q. That's a good point.
A. unless the rider is captured in some way by the vehicle. Generally the rider is thrown off on the first upset to the ground. But I have seen the rider make one complete revolution on the vehicle. I have seen pictures of Mike Chester staying with the vehicle with only a leg sticking up out of it. So it's not impossible, but it's not the commonplace. Generally the rider is thrown clear or the vehicle rolls off of him, leaves him on the ground after the first. But I have certainly seen them upset and have seen the rider go around once, yes.
Q. And walk away?
A. And walk away, sure.
Q. And have you seen the vehicle not be damaged at all?
A. I would have to say I have seen no major damage. On the ones that I saw, I have not taken the time to go over there and really give an in-depth inspection, but I would have to say very little damage.
Q. You have seen it to where you only walk out and there's only a little, bitty scratch on the paint?
A. Well, once again, I have not walked over to try to inspect it. Generally the handlebars bend or levers break, is what I typically see.
Q. In your experience, isn't it true that more times than not you get more damage to the vehicle than just a little paint scratch in the back? More times than not? If you do a 360 and some-odd end-overs?
A. Well, I would have to say generally I see the handlebars bend and the levers break. That'sThat I would have to say is most common.
....
Q. Are you going to tell me that more probable than not, more often than not, the rider walks away after doing that 360 coming over, going down on the ground, the vehicle on top of him rolling over, comes back up, he doesn't have an abrasion to his head, not a cut on his shoulder, his neck's fine, he pops up, walks away and says, "Let's go home"? More often than not, is that what you see?
A. Well, I'm not sure I can characterize my answer to that question that you have given me. But I would have to say in most of the upsets I have observed on *756 ATC's, the people are uninjured. Now, you're saying a high speed.
Q. No.
A. 30 miles an hour with a complete rollover?
Q. I'm talking about high speed, 250-R, 30 mile an hour, roll over at least once, roll over at least again, crash into another vehicle. That's what I am talking about.
A. I'm not sure that I can even tell you I have seen two complete rollovers where the operator stayed with the vehicle and crashed into another vehicle. So from that point I'm not sure I could associate what injuries may or may not have occurred. I don't know."

5) William F. Kitzes
William F. Kitzes, accepted by the court as an expert in the field of product safety management, testified on behalf of plaintiff. He stated that in the past 10 years, over 400,000 injuries associated with ATVs were treated in hospital emergency rooms, and there have been approximately 1,500 deaths associated with ATVs.
In Kitzes' opinion, Honda had knowledge of the lateral instability problems of its ATCs as early as 1979, as evidenced by worker's compensation claims of test riders injured while testing Honda ATCs. From the inception of the marketing and sale of ATVs, ATV manufacturers should have conducted extensive training programs, and should have disseminated through safety publications, training and owner's manuals, or other media and marketing devices, safety strategies similar to those outlined in the consent decree. Explicit instructions should have been provided in a training, safety or owner's manual for the execution of quick or speed turns.
Kitzes said that in 1982, Honda provided straightforward information to Japanese consumers about the true characteristics of the ATC in the "Super Trike" publication. This type of information was not made available to the U.S. consumer until required by the consent decree. In the "Super Trike" publication, ATC operators were given detailed instructions on performing quick or spin turns, including the distinction between a left and right quick turn. It also gave detailed instructions on the skid turn, which is a high speed turn. The operator was instructed that:
"[t]he important point in making a skid is the timing, and the trick consists of throttle work and the movement of your hips. Place your body weight on the footpegs and move as if you push the ATC to the outside. As you increase your speed, your body moves further to the inside and lower. Body movement in turning at high speed is the opposite of when turning at low speed. You can learn the difference in body movement at high speed and at low speed only through training and experience."
It further advised that the operator must "get a feel" for the ATC before performing a skid.
In Kitzes' opinion, the reason that the CPSC was terminating the rulemaking proceeding was that ATV injuries had been reduced because of the consent decree which banned the sale of three-wheelers. Thus, there was no longer a need for a regulatory act.
When queried about the relationship between the number of injuries associated with ATVs and the number of new ATVs sold and those previously in the hands of consumers, Kitzes responded:
"Q. Mr. Kitzes, isn't is a fact that with your study of various products that you have concluded that the more products you sell, the more incidents of injury and accidents you can expect? Isn't that correct?
A. Absolutely not. That unfortunately has been Honda's response, that the more products they can sell, the more people they're allowed to injure and kill. And I contend that that's wholly false, inadequate, and creates significant cause of injuries to the public. And that is the problem.
Q. So in other words, if we have a particular product on the market and say we have 500,000 in use and we have, say, 100 accidents and then the next year we double the number that we sell, so now we have, say, a million point five out there and in the next year not onlyyou don't have *757 100 accidents, but now you have 200 accidents, are you telling me that that indicates that there's a problem with the product?
A. Wouldn't it be wonderful to say the more we could advertise, the more we could make a profit off the public, that the more we can sell, the more people we're allowed to kill. If you want to sell that product and you got a problem with that product, then you have to take more steps when you're selling more products to reduce injuries.
....
Q. What I asked was when you have a particular product and a certain number out on the market, let's make it easy, say we have 500,000 and you have 100 accidents and the next year you double it, you sell a million a so now you have a million point five out there and the next year your accident rate doubles, too, to 200, is that an indication that there's some sort of a problem or defect in the product? A simple question.
....
A. You need to look beyond just the number to makeYou changed your question. To make a determination of a defect. But it's not allowable just because you sell more products to kill more people.
....
Q. My point is, simply because the rate of accidents increase and injuries increase doesn't necessarily indicate that there's a problem with the product, especially if the sales of that product double or triple in the corresponding year?
A. That's a different question again. And it might."
When questioned regarding the comparison between the number of ATV-related injuries and those injuries related to skateboards and other recreational products such as swimming pools, motorcycles, bicycles and snowmobiles, Kitzes responded that he was aware that there were products that have more injuries per year than ATVs. He also admitted that he was aware of criticism of the Fortieth Report by the Committee on Government Operations by various staff members of the CPSC, including the chief of epidemiology and an analyst for the department of economics. Their criticism was apparently aimed at the Committee's interpretation of data regarding the injuries associated with ATVs. Additionally, Kitzes was aware of a report by the medical director of the CPSC which essentially stated that the vast majority of accidents and injuries associated with ATVs involved errors in human judgment rather than defects in the ATVs.

6) Edward Glynn
Edward Glynn, employed by the American Honda Motor Corporation as assistant to the executive Vice-president in the Product-Legal Division, was called on cross-examination by plaintiff. Glynn has an extensive background with motorcycles, having built engines for Harley Davidson and other national manufacturers. He also raced motorcycles professionally. Glynn was previously the National Motorcycle Sales Manager for American Honda. ATVs were part of the Motorcycle Division of American Honda. Glynn stated that most of the staff in the motorcycle division are motorcycle riders; they ride ATCs as well; a separate corporation, Honda R & D (Research and Development) performed the engineering testing on ATCs in various areas of the world; and the testing performed by American Honda was warranty and durability type testing. In his opinion, any testing of ATCs over different terrains and at different speeds necessarily includes safety as a part of the testing process.
He said that most ATV accidents are caused by operator error; the best way to prevent accidents is by education of the public through labels, pamphlets, advertisements and the owner's manual; and the 1981 ATC 250-R owner's manual dealt with operator safety throughout. He pointed out the pertinent parts dealing with operator safety. On the cover was the notice "READ BEFORE YOU RIDE." On the inside cover was the notice "READ OWNER'S MANUAL CAREFULLY." It continued that the warning symbol in the manual "[i]ndicates a strong *758 possibility of severe personal injury or loss of life if instructions are not followed." The preface contains the warning symbol and the statement "The ATC 250-R is a high performance machine, based on the latest motocross technology. It is intended for use by experienced riders only. Although it is a recreational vehicle, it is definitely NOT A TOY."
Page one of the manual provides in pertinent part:
"ATC SAFETY
WARNING
* ATC riding requires special efforts on your part to ensure your safety. Know these requirements before you ride.

SAFE RIDING RULES
...
* Know the terrain on which you are riding. If you are not familiar with the terrain, ride cautiously. Hidden rocks, holes or ravines could spell disaster.
* Your ability to operate safely is largely dependent upon your proper judgement in operating the machine.
PROTECTIVE APPAREL
* Most cycle accident fatalities are due to head injuries: ALWAYS wear a helmet. You should also wear a face shield or goggles, boots, gloves and protective clothing."
Page twenty-two provides in pertinent part:
"RIDING
WARNING
* Review ATC Safety (page 1) before you ride.
* Ride with both feet on the foot pegs at all times. If your feet are off the pegs to touch the ground while the ATC is moving, they may come in contact with the rear wheels, causing injury.

....
For your initial riding practice, select a safe area free of obstacles and with an even surface. Avoid paved surfaces as they make learning to maneuver more difficult, and will also significantly shorten tire life."
Page four provides in pertinent part:
"Turning Maneuvers
For better traction in off-road use, the ATC has been fitted with a rear axle which drives both rear wheels equally at all times.
When negotiating a turn, the wheel on the outside of the turn must travel a wider radius, and thus a greater distance, than the inside wheel. As the rear axle does not permit a differing rate of wheel rotation, it is not enough to merely steer the ATC into a turn. The new rider must learn to shift his weight and control the throttle to allow the rear tires to negotiate the turn. This is the primary technique to be mastered in riding the Honda ATC.
Practice turning the ATC at slow, constant speeds. Defer higher speeds until you are confident of your proficiency.
Steer in the direction of the turn, and lean your body to the inside of the turn, while supporting your weight on the outer foot peg. Use the throttle to maintain power throughout the turn.
This technique allows the ATC to lean slightly toward the outside, altering the balance of traction between the rear wheels sufficiently to allow them to negotiate the turn.
Once this technique is learned, turning maneuvers can be performed within a relatively small area."
An illustration of the rider on the ATC is shown on the page. An arrow points to the outside foot peg which is labeled "Support your weight on outer foot peg." An arrow to the inside of the turn is labeled "Lean towards inside of turn."
Glynn was questioned about the inadequacies of the warnings and instructions in the owner's manual compared to those in the "Super Trike" publication and the U-Haul warnings. He responded that the owner's manual does not have any warning which specifically states the vehicle has a lateral instability problem; "ATC's corner strangely;" "ATC's flip every which way," or "Anyone *759 who thinks that the ATC appears easy to operate because of its steady appearance on three wheels is mistaken." However, the manual adequately informs and warns the rider about how to make turning maneuvers. Glynn does not believe the U-Haul warnings to be true. He was further queried:
"Q. Anyone who thinks an ATC is easy to operate is mistaken." You don't agree with that either, do you?
A. Well, I guess it depends on what level of riding you're going to ride at. And so if you're talking to experienced riders and enthusiast people, that may be true, that to ride at that level it's not as easy as it appears. If you ride at top levels, try experienced riders. If you're talking about learning to ride and developing skills, I think they're fairly easy to ride.
Q. So you think it's easy to ride and develop learning skills?
A. If you practice, use judgment, ride slowly and develop your skills over a period of time, then I think it's true, yes.
Q. Now, I want to go back because I thought we agreed, but I think we disagree; we might agree. So you disagree with this statement, "anyone who thinks that the ATC appears easy to operate because of its steady appearance on three wheels is mistaken." You disagree with that? You believe it's easy to operate?
A. I guess it's like a lot of things. There isn't a simple yes or no. If you areIf you're talking to people that are experienced, that are experienced motorcyclists, for example, experienced off-roaders, and you're talking about a high levels [sic] performance, then I think those levels, whether you are on an ATV or a motorcycle or other vehicles, are not easy things to do if that's your audience.
Q. Well, let us talk about
A. If you're talking to a person about the developing, beginning rider, developing skills, I think it isn't difficult to ride as long as you ride with care, ride slowly and develop your skills over time.
Q. So you would disagree with that statement?
A. I would agree and disagree. It just depends on what your riding skills are.
Q. You would disagree for beginners and agree for advanced riders.
A. If that is what you're talking to, an advanced rider, and you are talking about high levels of skill.
Q. But for beginning riders you would disagree with me. You think it is easy to operate?
A. As long as you ride slower, ride within your skill level and practice, I think it's fairly easy to operate, yes.
Q. Anywhere in there does it say you have to use your wholeexcuse me, just turning the handlebars will not turn the vehicle?
A. Yes, it's dealing with that area about shifting your weight, that sort of thing.
Q. Can you show me in there where it says just turning the handlebars will not turn the vehicle?
A. It says `When negotiating a turn, the wheel on the outside of the turn must travel in a wider radius and thus a greater distance than the inside wheel. As the rear axle does not permit differing rates of wheel rotation, it is not enough to merely steer the ATC into a turn. The new rider must learn to shift his weight and control the throttle to allow the rear wheel to negotiate the turn.' Basically it's saying that.
Q. But you disagree with the statement `it is more difficult to operate than it appears'? You think it's easy to operate for the beginning operator?
A. It depends on what level, what you're talking about. If you're talking about racing, for example, that takes a great deal of skill."
He added that the "Super Trike" document introduced by plaintiff is a sales brochure developed to sell ATVs to experienced off-road motorcycle riders in Japan; it was not an owner's manual; the 1981 250-R owner's manual contains the same information although it is directed to novice rather than experienced riders; the 250-R is primarily a sports bike, suitable for racing but ridden *760 primarily for sport riding; the experience needed to ride a 250-R could be gained by riding less powerful machines; and the 250-R was the first ATC on the market with a mechanical suspension system as well as the first for sport riding and suitable for racing. The racing advertisements showing the racing of ATCs and riders performing wheelies were for the purpose of demonstrating the technical quality of Honda products to enthusiasts. He denied that the purpose of the 250-R promotion was to "get out on a 250-R and go fast as you can." The purpose of the promotion was to advertise the technical quality of Honda products.
When questioned about the number of test riders injured on ATCs, Glynn responded that the vehicles were run in the desert on hot days with the throttle "near wide open" through difficult terrain.
When testifying regarding the number of ATV associated injuries, Glynn stated the number of units sold increased tremendously over the years to 1984. During that period the number of ATV-related injuries increased, but the rate of injuries did not change. He said that the injury rate should be calculated by combining the number of ATVs sold annually with those already in use. ATV-related accident statistics include any type of injury associated in any way with an ATV, e.g., unloading an ATV from a truck bed and dropping it on your foot; or driving an ATV while a shotgun is slung over the operator's shoulder, the shotgun catches a branch and the operator is accidentally shot in the leg.
Glynn was qualified as an expert in Consumer Products Safety Commission regulation and action. He was the American Honda representative assigned to deal with the CPSC and its staff, and testified that American Honda and other manufacturers cooperated with the CPSC and provided the CPSC staff with ATVs for testing purposes. They were asked to work with the CPSC on voluntary standards for the industry and they tried to do so.
He reasoned that American Honda entered into the consent decree for these reasons: (1) to end the negative publicity, (2) to avoid protracted litigation and legal costs, (3) they agreed that the safety-related requirements would be a good idea and (4) the sales in three-wheelers had plummeted and Honda agreed to the discontinuance of the three-wheeler to end the whole matter, at least until voluntary standards mutually agreed upon between the industry and the CPSC were established.
Regarding Kitzes' previous testimony that Honda did not have a safety program and that it did not distribute safety materials, Glynn stated that Honda had a large national safety program which included the publishing of several safety or instructional booklets, safety posters, national television advertisements, print ads, posters and counter cards in dealerships, and video films on how to ride an ATC. Additionally, the SVIA (industry standards association) also had an on-going safety program.
When asked if the given injury rate was acceptable, he responded:
"It's unfortunate ... If it were caused by the product, ... when it would really be unacceptable completely. The facts are that they didn't find a problem with the product design that they said was related to these accidents. We don't believe there is either. But we certainly did a number of things to try and help people with safe operation. What they did find is 131 out of 164 deaths, for example, in '89, were all caused by operator [sic]. They found another 20 percent caused by the environment, 15 by bystanders, and just a very few that even had product relationship. And even then, there wasn't anything they had as a suggestion to improve it other than awareness, which we had said in the very beginning and we continued to do. And we continue to look for ways to try and help people find and think about what they're doing, pay attention, and ride safely. It's like seats belts in cars. You put seat belts in, you put buzzers in, you publish and you go on television, you ask people to put input on their seat belt, you pass laws and still only about 75 percent of the people put a seat belt on.... But you can't make people doeverybody do what they should do. And ATV's are like other products. You can't force people *761 to do everything that maybe makes common sense. But we tried a lot of different ways to help them do it; training programs, safety materials, national television, spokespeople, hang tags, as many things asmaybe there's other ways, but we keep looking for ways and doing it with all our products, because we're concerned with people being hurt with products, one, because we're riders ourselves and we like them, two; it makes good business sense to help people not be hurt. It doesn't make sense to allow people to be hurt if you can help them."
Glynn stated that in the Notice to Terminate Rulemaking, the CPSC did not conclude there was a relationship between the Kst stability factor and ATV accidents; it did not find a lateral stability design defect; it did not find the ATC defective in any way; and ATC three-wheelers were not recalled off the U.S. market. Regarding Kst, Glynn said:
"that within the range of Kst's of a three-wheeler or a four-wheeler they couldn't find a safety relationship. They did that study because they wanted to do a rule-making. They did a study of exposure and injuries for the purpose of establishing rules where they could dictate the level of Kst, Kst or the tippiness, that would have to be met. They found from that that there wasn't a correlation so they dropped that whole Kst. In fact they dropped ANPR. They voted in September of '91 to discontinue the ANPR at all."

B) DEFENDANT

1) Richard Gross
Richard Gross was accepted as an expert in Consumer Product Safety Commission regulation and action. He is a former Executive Director of the CPSC and testified on behalf of defendant. The Executive Director is the senior appointee of the Commission and is in charge of the CPSC staff. The staff is comprised of scientists, engineers, lawyers and safety analysts. Gross reviewed the Task Force Report and the 1991 Notice of Termination of Rulemaking Proceeding. His opinion was that after thoroughly investigating the ATV issue the CPSC staff concluded that the ATV is not defective and that people want to continue using it. Had a defect been proven in a nonjudicial proceeding, the Executive Director had the right to order the recall of all ATVs which were already sold and in use, as well as ban the sale of all new ones. The staff could not identify engineering improvements, including the Kst factor, which would make the ATV safer or more useful; thus the CPSC voted to stop work on the proposed rulemaking. Three-wheelers were never recalled, and at time of trial there were 2.4 million three-wheelers in use.
Gross was queried about the Fortieth Report by the Committee on Government Operations, particularly that part in which the Committee found ATVs present an imminent and unreasonable risk of death, serious illness or severe personal injury. Gross responded that the Congressional Committee which issued the report did not understand the data which the CPSC staff had accumulated, analyzed and reviewed. The CPSC has the staff of experts with the expertise to determine whether there is adequate evidence to make such findings. Apparently, the staff did not find the data and evidence sufficient to declare that ATVs do present an imminent and unreasonable risk of injury to consumers and thus there was no need to act immediately to recall ATVs from the hands of consumers. Gross was then asked whether he agreed that the CPSC should have taken the actions requested by the Committee, i.e., removing all ATVs from the marketplace. Gross responded:
"A. There's no evidence available that would allow that to be done under the laws of the United States.
Q. Now, you are not qualified as an engineer, are you?
A. I'm not.
Q. You're not qualified as a safety engineer are you?
A. That's correct. I am not.
Q. You are not, correct, a product safety management person, are you?
A. I'm not a product safety management person, no.
Q. You're not qualified as an ATV rider are you?
A. I do not ride ATV's.

*762 Q. You're not qualified as a statistician, are you?
A. I'm a lawyer, that's all I'm qualified.
Q. Yet you just told us that you looked at all of these reports that were in there and it's your opinion that they didn't have enough information to do it. And furthermore, it's your opinion that the committee of the United States government, with all of their staff, are wrong when they said that they did not have enough information to do it. That's right? Is that correct?
A. That's because I'm qualified in evaluating exactly those kind of reports.
Q. I see.
A. And in that qualification, which is not the technical qualifications, but it is the job of enforcing that particular law, I am comfortable that my opinion is correct that there was no data that the staff ever found to justify the kind of conclusion you just read. There isn't any data."
In Gross' opinion one of the reasons the CPSC terminated its rulemaking proceeding is that it was concerned that it would not succeed in a court of law in litigating this case to its conclusion.

2) Roger Lee McCarthy
Roger Lee McCarthy was qualified as an expert design and safety engineer. He is the President and CEO of Failure Analysis Associates, the largest engineering firm in the nation which is dedicated to the analysis and prevention of failures of an engineering nature. His company has the largest independent vehicle crash test laboratory in the nation and performs approximately 70% of all independent crash tests. It maintains a copy of all computerized accident reports which are collected by the federal government, including all computerized accident data of the CPSC from 1972 to date.
He testified that the NEISS (National Electronic Injury Sampling System) statistics are drawn from sample hospital emergency rooms where an employee paid by CPSC records any injury associated with a consumer product. This is the core of the CPSC accident data, and it allows the CPSC to monitor accidents in every product data category. They track about 850 product categories. Any abnormal pattern of injuries would signal an alarm to the CPSC to start monitoring a particular product closely. The NEISS system assembles data on injuries associated with a product, not necessarily caused by it, and individual accidents are not investigated, they are just reported.
McCarthy performed numerous safety evaluations and analyzed accident data on ATVs collected by the CPSC. In discussing the accident data of the CPSC, McCarthy found that the probability of an accident involving a female ATV operator was significantly less than that of a male operator. This, he said, illustrates:
"whether or not the accident risk is bolted on the vehicle like a fender. In other words, if the accident risk is part of the machine, part of the design, it doesn't matter who rides it. You can't change it. If it's part of the machine, bolted on there like fender [sic], it doesn't matter who gets on it.
If a man were riding it, or a woman were riding it, or kid were riding it, we'd expect to see the same accident risk; because the risk is built-in. But, if the risk is under the control of the operator, that is how he rides it, determines how risky it is then, of course, the risk changes with the characteristics of the operator.
And sure enough, even putting a male on it makes a big difference, whether it's an older man or a younger man. That's probably no[t] surprising; cars are sort of like that."
Additionally, the age of the female or male operator affects the probability, as well as the use of alcohol by operators. Approximately 56% of accident fatalities of drivers over 18 years of age are alcohol related. This is similar to the percentage of fatal car accidents.
He stated that at the time that the ATV Task Force Report was published in 1986, there was controversy within the CPSC staff, particularly by the Chief of Epidemiology, regarding whether a comparative risk analysis should be performed between ATVs and other recreational vehicles. However, it was *763 not until 1989 that the CPSC actually performed a comparative risk analysis.
A memorandum dated November 7, 1986, to the Executive Director of the CPSC from Nick Marchica, Chairman of the All-Terrain Vehicle Task Force, included comments written by Dr. Robert Verhalen, Associate Executive Director for the Epidemiology Directorate of the CPSC. Dr. Verhalen's observations were critical of the findings and data analysis in the Fortieth Report by the Congressional Committee. In response to the Committee's statements regarding the alleged unprecedented level of death and injuries associated to the ATVs, Dr. Verhalen observed:
"The deaths and injuries are not at all unprecedented. Skateboards, for example, over the four year period 1974-77 virtually `exploded' from under 4,000 injuries per year to about 155,000 injuries per year. Bicycles are typically reported to be associated with well beyond a half million injuries each year. While deaths reportedly associated with skateboards during the above mentioned period only numbered about 25, deaths associated with a number of other products usually run considerably higher than are reported for ATVs. For example, during the same four year period covered by the ATV report (1982-85), swimming pools were involved in more than 2,700 deaths, bathtubs and showers were involved in nearly 1,700 deaths, mobile homes were involved in nearly 1,500 deaths, and bicycles were involved in almost 3,600 deathsto mention only a few other products.
....
Beginning at the bottom of page 2 and continuing at the top of page 3, the report argues that ATV related injuries are `substantially higher than proportionate figures for minibikes/trail bikes and snowmobiles.' This is precisely the sort of misinterpretation which I was trying to correct with my June 13, 1986 memo. The authors of the report have interpreted the data presented in the ANPR at face value, failing to recognize or give credence to earlier caveats about the non-comparability of the data.
Proportionate figures ... would be those which take into account some common factor which would make them comparable, such as a rate of incidents per some meaningful unit, such as exposure (in hours, days, or some other index of use). This is essential if comparisons are reasonably made. Accordingly, injuries per 1,000 vehicles in use, adjusted for exposure (ATVs, mini/trail bikes, snowmobiles with relative exposure values of 10:2-3:1
ATVs = 4.5 per 1,000
 vehicles in use
mini/trail bikes = 7.9-11.9 per
 1,000 vehicles
 in use
snowmobiles = 8.5-12.7 per
 1,000 vehicles
 in use
As I made clear in my June 13 memo, these estimates are not definitive. The empirically based, comparable exposure surveys we requested funding for could have provided what we needed for a definitive analysis. Absent that however, based on the testimony at the Commission ATV hearings, these estimates are still the best information available. Also, as I pointed out in the June 13 memo, one cannot attach any statistical significance to the above differences."
McCarthy discussed results of a 1988 study by Greg Rogers, an economist in the Division of Program Analysis of the CPSC, which resulted from a comparative study of motorized vehicle safety data. The study analyzed the risk of fatality and risk of injury for on-road motorcycles, snowmobiles, ATVs, minibikes and trailbikes per million exposure hours. The data showed on-road motorcycle riding to be substantially more hazardous in both risk of injury and risk of fatality. The ATV was apparently "well within the range of risks on comparable recreational vehicles." McCarthy also discussed results of a 1991 CPSC study which showed 15.3 estimated injuries per 100 competition ATVs in use compared to 8.1 general use ATVs. It's a "hotter" machine and performs better than other ATVs. However, like hot sport cars, *764 they have higher accident rates because people exploit their advantage because they are driven more aggressively.
Another CPSC internal memo was also discussed by McCarthy. The memo was dated September 17, 1990, from Gregory Rodgers. The subject was the 1989 ATV Risk Analysis. Rodgers had concluded that:
"If Kst significantly reduces the injury risk within the class of three-wheeled vehicles, the coefficient for Kst (3-wheel) should be negative and significant. Similarly, if Kst significantly reduces the injury risk within the class of four-wheeled vehicles, the coefficient for Kst (4-wheel) should be negative and significant. In both cases, however, there is a statistically non-significant positive coefficient. ("Statistically non-significant" means that the coefficients are not statistically different from zero.)
....
These results therefore indicate no statistically significant relationship between the injury risk and Kst values within either the class of three-wheeled ATVs (with Kst values ranging from 0.54 to 0.67) or the class of four-wheeled ATVs (with Kst values ranging from 0.87 to 1.08)."
McCarthy stated that this showed that the more stable vehicles (both three and four-wheelers) had slightly more accidents than the less stable ones. The reasons for such are:
"A.... [I]f you look at something like a Chevrolet Corvette, it has five times higher roll over rate than the average car per car.
Q. But does the Chevrolet Corvette, does that have a lower center of gravity or a better KST, whatever you call it?
A. If you ever try and get in and out of one you know they're not high. Corvettes and Datsun Z's and Porsche 911, those cars are out there. They are low and they have roll over rates that you can see is triple or quadruple the average car.
Why? Certainly they have more stability. A Corvette can go through a slalom course that will bury anything else out in the parking lot. If a vehicle has that capability, people use it.
They use the big engine. They use the stability to go around corners faster, use up that margin and in fact typically drive the vehicle more aggressive than the average car is driven.
So the result is higher stability allows people to drive a vehicle more aggressively. We see it all the time in cars. Your best performing vehicle that is the things that do best what a car does. They stop, they start and they get there the fastest. They roll over most often. They saw the same thing in ATV's."
In McCarthy's opinion the final conclusion of the CPSC in 1991 was that ATV riding poses no more risk than other recreational activities, not an unreasonable risk, nor a risk which required special regulation.
On cross-examination McCarthy disagreed that driver education and training are the keys to safe operation of an ATV; there is approximately the same risk for fatal injury in operating ATVs (.5) as for operating passenger cars (.47). He disagreed that the majority of 250-R accidents are caused by operators going too fast and not knowing how to handle the machine. His opinion is that the majority of injuries were caused by carrying a passenger, drinking alcohol, or riding on a roadway. He disagreed with the report by the previously discussed Committee on Government Operations, stating that at the time it was written it was wrong, and the comparative studies by the CPSC in the 1991 report proved that it was wrong. When asked whether the witness disagreed with the United States Congress the witness responded:
"No. The CPSC has decided there's no unreasonable hazard and decided not to recall these. That oversight committee report is disagreed by the other half of the oversight committee. However, now that we have completed the second and much larger study, there is no disagreement by anybody who has studied the comparative data. Everyone has looked at it and has published a syndicated as I have testified, that there's not an unreasonable risk associated with ATV's."

*765 3) Alan Dorris
Alan Dorris, accepted by the court as an expert in the field of warnings and human factors, testified on behalf of defendant. He stated that for a warning to be beneficial to a person, that person must see it, understand it, believe it is truthful, believe that it applies to himself or herself, and the person must decide to follow the warning. An attempt to warn about every possible harm which could befall a person using a product would amount to a "warning overload", and that person would tend to ignore all warnings about that product, simply because the individual would be unable to separate the important warnings from the less important ones. Furthermore, it has been proven that there is no one word such as "danger," "caution," or "warning" which is more effective than another, nor is there a magic formula which is more effective than another in formulating an effective warning; and using consequential language is important when the person being warned does not know of the particular consequences of a hazard of which he is being warned. He stated:
"The whole literature leads us to conclude not that warnings are never helpful, because I think warnings can be helpful sometimes, but that if someone is determined how they're going to behave, it is extremely difficult to modify that behavior on the basis of a warning label."
Dorris stated that the ignoring of a warning by a particular individual is a behavioral determination, e.g., it's too much trouble to comply, peer pressure, willing to run the risk. He cited as specific example motorcycle riders who defy authority in choosing not to wear a helmet when riding. A warning can be effective when it provides a person with information which he otherwise would not know; the information is understood and believed by the individual and the individual chooses to comply. Thus, a warning should not be exaggerated or overstated. People ordinarily learn to safely use products by past experience, observation, and through information provided by other people. In most instances, formal training will not affect a person who is determined to take certain risks. Dorris disagreed with the skull and crossbones insignia used as a warning by Haul on ATVs. In his opinion, the effect of this insignia on an ATV would tend to attract rather than repel teenagers and young males as a symbol of being tough or bad.
In Dorris' opinion, an owner's manual is an appropriate place to provide to the operator information about the product, information about safety, and some information about riding it. An owner's manual would not be expected to contain everything there is to know about the product. However, people have become accustomed to looking to an owner's manual about this type of information. The 1981 250-R manual directs the reader to the labels on the ATC which in turn directs the reader to the pertinent part of the manual.
In his opinion, from a human factor point of view, the 250-R at issue is not unreasonably dangerous or defective. He testified the precautionary information contained in the manual is appropriate for the 250-R, and that "without ever reading a label, even without ever reading the owner's manual or riding the machine, there's certain things that we can figure out just by on the basis of common sense and past experience." Further, he stated that a manufacturer is entitled to assume that people will use the manufactured product in "conjunction with the law and use it in conjunction with the warnings... given and use it in conjunction with common sense".
On cross-examination Dorris was asked whether the advertisements of the 250-R encourage the rider to engage in high performance maneuvers on it. Dorris responded that the advertisements encouraged the purchase and use of 250-Rs, however, it did not necessarily make riders want to race them. He was further questioned:
"Q. Why do you think Honda was paying millions of dollars to advertise this if they didn't want people to buy 250-R's, because they were high performance machines and encourage them to do high performance maneuvers on them?
A. I think it's for the same reason that so many people want to have their products advertised on a race car. Whether it be a stock car or an Indianapolis 500 racer, *766 you could hardly see the car because there's so many stickers of different people who want to endorse their products. It doesn't mean that you necessarily want to go out and race because of that. But it associates their product and its characteristics with something that people are interested in and I think it does make people or it's intended to have people have an interest in this high performance vehicle."
When asked whether Honda should have included instructions in the owner's manual which would specifically instruct people how to do high performance maneuvers such as riding on two wheels, spin turns, etc., Dorris responded:
"A. If there were a section in this owner's manual that showed people how to ride on two wheels, you would have a fit. I mean thatthat's not what we expect in a basic owner's manual. You have to be a highly experienced rider to be able to do that safely.
Q. Well, I got a good question for you then, Alan.
A. I'm looking forward to it.
Q. How do you get to be a highly experienced rider?
A. The same way you learn to be a highly experienced automobile driver or anything else.
Q. Bicycle rider, by falling off like Steve Drury did, right?
A. No. You don't have to fall off. What you do is you start out slowly, you practice techniques and the better you get, the more challenging things you can try. You don't go out and try things that are over your head."

4) Donald A. Banks, Jr.
Donald A. Banks, Jr., accepted by the court as an expert in the field of riding ATVs, testified on behalf of defendant. Banks is a national and world champion motorcycle and ATV racer. He has owned five or six or more ATC 250-Rs and has had hundreds of hours of riding experience on them. He rode a 1981 250-R for purposes of trial and said he would categorize it as a good all-round sport vehicle, and it handles well. In order to race it competitively, it would need lots of modification because it is "kind of governed down or slow." Among the modifications required are a larger carburetor to flow more fuel; port work to increase RPMs which increases the horse power; a special muffler system; different tires depending on the race course; and suspension and axle width modifications. In his opinion, based on his riding experience in general, and with the 1981 ATC 250-R in particular, the 1981 250-R is stable. It did not turn over easily when making avoidance and braking maneuvers; it stopped well despite sliding a bit over wet grass; and he had no difficulty with the handling, operation or stability of the vehicle.
Banks stated that when racing or playing, the rider must be constantly aware of what's happening around him. However, accidents can occur when something suddenly appears in the rider's path. Banks admitted to having been involved in collisions and accidents despite constant awareness.

5) Edmond R. Cababa
Edmond R. Cababa, accepted as an expert in the fields of engineering, accident reconstruction and riding, testified on behalf of defendant. A 250-R was exhibited in the courtroom, and Cababa discussed the various mechanics of the vehicle. He pointed out the engine stop switch which kills the engine immediately. It is located on the right handlebar, accessible to the right thumb.
Cababa stated that ATVs are rider active, i.e., the rider can use his body to enhance the performance of the vehicle. In doing so, the rider becomes part of the machine which affects or changes the system CG. The system CG is the combination of the center of gravity of the vehicle and the center of gravity of the operator. Motocross motorcycles operate similarly. The center of gravity of an ATV is the measurement of where all the masses can be concentrated, and from where, if the vehicle were supported at that point, it would be balanced. The center of gravity of the 250-R is near the kickstarter. The center of gravity of a rider is usually near the belly button. When the two centers of gravity connect, the system CG is somewhere between the two centers of gravity. For *767 example, if the rider is light weight and the ATC weighs 300 pounds, the system CG shifts closer to the vehicle center of gravity. The movement of the rider, how he stands and sits on the vehicle, shifts the system CG. In his opinion, the location of the system CG of the 250-R is not defective.
Cababa stated that the Kst (ratio of the width of the vehicle support and the height of the center of gravity) or stability ratio of the vehicle was "just fine." There is no one number for a stability ratio which should be mandated for ATVs to be stable. Stability ratios vary depending on the type of vehicle, type of operation, and the environment in which it is operated. From the stability ratio of a sports car compared to a station wagon, it would seemingly appear that the sports car is more stable. However, sports cars have higher rates of rollovers than ordinary automobiles. This points to the vehicle operator and environment in which the vehicle was driven as the causes of the rollover.
The 250-R had front and rear suspension which is useful in off-road settings because it isolates the rider from the ground, providing him with a level of comfort. This in turn increases his ability to stay in control and his ability to travel over rough terrain at higher speeds. Cababa said that he has worked on vehicles and reconstructed accidents but has never seen a broken carburetor spring, nor has he seen the spring cause sudden acceleration of a vehicle. In Cababa's opinion there is no design defect in the 250-R and its component parts; in its handling; its stability; its dynamic stability; and it is an excellent form of transportation.
Cababa was of the opinion that the accident occurred in the following manner: as Schliegelmeyer was operating his ATC, plaintiff came up behind him and plaintiff's front tire struck the Schliegelmeyer vehicle. Schliegelmer slowed down and plaintiff's vehicle climbed up Schliegelmeyer's vehicle and came to a stop. While this was occurring, plaintiff placed his right leg out for balance, thus making it susceptible to the type of injury which would be consistent with plaintiff's injury. In his opinion, plaintiff's account of making a 360 degree roll is not consistent with his injury:
"A ... The description that I understand Mr. Drury gave was that he was making a right turn and the vehicle then started to move with the left wheel comingI'm sorry, the right rear wheel coming up. The then describes tumbling over and then comingand he doesn't know how many times, but coming to rest in a somewhat upside down fashion. The direction of that motion would have moved Mr. Drury to the left, thus exposing his left side to injury, not his right leg, and that wouldand what that would do is, I would expect that he would have a different injury pattern.
Mr. Drury was also not wearing a helmet, and with a vehicle going over like this, I would expect to see perhaps a head injury. I would also expect to see at least some reporting of left leg or left shoulder or left side injuries in some fashion from a violent maneuver like that.
Q. Mr. Drury described that he did this rollover, at least 360, staying with the vehicle the entire time. How much did that vehicle weigh?
A. Well, the vehicle weighs, with gas, about 310 pounds.
Q. As an accident reconstruction expert, as a man who's looked at motorcycle accidents, other accidents where anthropomorphic dummies are viewed, and then they go back and see what's broken, what's damaged, what's injured, et cetera, can you tell me whether it's possiblewhether it is possible for a man to be involved in an accident on a 350 pound ATC, pitch to the left, take at least one full roll, perhaps another half roll, stay on the vehicle, end up with the vehicle on top of him, and get up and ride the vehicle to a truck, put it in the truck, go home, and then sometime later that night decide "I'm going to go to the emergency room and get a checkup"? Can you walk away with those injuries?
A. Not that type of accident, no.
Q. Wouldn't the man almost be crushed as he's rolling around under there?

*768 A. I don't think he would be crushed, but he certainly would have had a different exposure injury to his left side.
Q. And if, as Mr. Drury suggests, he makes a pitch roll to the left I think you said before to the Jury, what type or where would the injury be? Would type or where would the injury be? Would it be to the left or the right leg?
A. I would expect injuries to the left side. It really depends now on how he's going to come off of the vehicle, but definitely exposed injuries to the left side.
Q. Would it be fair to say that the type of injuries sustained by Mr. Drury is compatible with the story told by Mr. Schliegelmeyer?
A. Yes, it is.
Q. Would it be fair to say that the type of injuries sustained by Mr. Drury is totally inconsistent and impossible when you compare it to the story he told of how the accident happened?
A. Yes, it would be."
On cross-examination Cababa stated that the owner's manual does not contain any instructions for stunt riding; the only instructions are for basic operation of the ATC; the top speed in second gear is 25 m.p.h., in third gear it's 34 m.p.h.; and the 250-R is primarily a sport or recreational vehicle which can be modified for racing as Schliegelmeyer modified his 250-R. A hypothet similar to plaintiff's version of the alleged events leading up to and including the accident was posed to Cababa. The hypothet was as follows: the lead ATV was traveling 25 mph; the second ATV was following about 40 feet directly behind the lead vehicle; the second ATV accelerates to 35 mph; the throttle of the second vehicle is stuck and the driver realizes that in 1½ seconds:
"Q ... if he continues at the same speed, in the same direction, he will strike the three-wheeler in front of him.
A. If he does nothing, that's correct.
Q. Now, let's also assume that there is an opening in front of the front vehicle through which only one can pass. So he cannot pass him.
A. All right.
Q. Cannot pull to either side and pass him. Okay. Would it be possibleand I believe we have talked about complex reactions taking one and a half to two and a half seconds. If I understand your testimony about the operation of a vehicle, at that point he has to eitherhe cannot release the throttle, he has to either slow up by opening his hand up and grabbing the clutch, which would slow him up not significantly, he could hit the kill switch which would slow him up somewhat by the torque of the engine in a compressive mode, he can hit his right brake or his foot brake or both of them.
A. That's correct.
Q. That would require what you called a complex reaction, wouldn't it?
A. No.
Q. So you're telling me if he ishas one and a half seconds before impact, he has to decide to do something, one of those three are turn to avoid him, that's not a complex decision?
A. At that point, no.
Q. Okay. Why do you think that's not a complex
A. Because the condition that causes him the concern is the engine and his approach speed, his position behind the other vehicle. He has been looking at this vehicle for the last 40 feet. So he has had an opportunity to regard the situation that is developing. He actually had to accelerate towards the other vehicle. And so he is prepared at that particular point for, or should be prepared at that particular point for some sort of reaction.
It's similar to when people take off in their cars and the person in front of you taking off and then stops suddenly. You are confronted with the same type of situation in that particular instance. And people, if the car doesn'thasif there's a condition where you're not paying attention, you can hit the car in front of you. But if you're paying attention you will not hit the car in front of you and those are not complex reactions. Those are simple reactions.

*769 . . . .
Those are not complex reactions. Those are simple reactions, and simple reactions, it changes from a complex reaction to a simple reaction when you are aware of the situation that's developing. You don'tA complex reaction, as I described before, is where you're not aware of how that situation is developing and you have to look at the two vehicles to concern yourself with whether or not you are at an impact mode. I would consider a complex reaction to be at the 40 feet level when he begins to accelerate and he starts to wonder "am I going to hit this guy".
....
Q. If by continuing straight he will hit him, then he must turn to avoid him, doesn't he?
A. If that's your decision, thenthen you make that maneuver at the beginning. You don't make that maneuver at the end.
Q. You make that maneuver when you are five feet from him and you decide either to hit your brakes or to turn, right?
A. Well, I would make the maneuver much earlier than that, but do you want me to assume byI can't.
....
Q. HeAt that point, he has to decide whether to attempt to slow down enough to not hit him or make a turn, one of the two, doesn't he?
A. Yes.
Q. Okay. And if he's going to make a turn, he has to make a drastic sharp turn to the right, doesn't he?
A. I would think it would have to be.
Q. And that is one of these turns, as I remember you described it, he was going to make a right turn, he's going to literally throw the bike over and kind of get it over, doesn't he?
A. If he wants to continue making that turn, yes.
....
Q. If I understand it correctly, what you said was that Mr. Schliegelmeyer was going at whatever speed he's going, we're talking, say, 40 feet per second, and Mr. Drury passes him up, and at this point he rides over him like this and this wheel climbs up?
A. No. I didn't say that.
Q. Could you tell me what you said?
A. What I said was that there was a bump between the two vehicles. Mr. Drury's vehicle made a bump first. That caused Mr. Schliegelmeyer to want to slow down. They're now both traveling, but Mr. Schliegelmeyer is slowing down again. And as Mr. Schliegelmeyer slows down near the end of their forward travel, that's when the vehicle makes another contact and rolls up.
....
Q. And, Mr. Cababa, you heard Mr. Schliegelmeyer's testimony and he said, "I felt the impact, I stopped, I looked back, the left side of his vehicle was across the back of mine.
Now, tell me how you know what part of Mr. Drury's bike contacted what part of Mr. Schliegelmeyer's bike, how hard they contacted, which way Mr. Schliegelmeyer veered off, which way Mr. Drury veered off, and how Mr. Drury's vehicle tumbled or didn't tumble based on that statement.
A. Number one, the damage to Mr. Drury's vehicle was unreported. In other words, there was no damage of any significant nature that anybody reported. Number two, Mr. Schliegelmeyer indicated that there was no damage to his vehicle. Number three, Mr. Drury's injury pattern is only to the right leg. It's not as a result of a tipover or a rollover to the left. The only way that you can have all of those conditions exist is to have Mr. DruryI'm sorry, did you want to
Q. You can use it.
A. is to have Mr. Drury expose his right leg to injury. The only way you can expose the right leg to injury is to have the vehicle go over to the right. If you go *770 over to the left completely, you expose the left side of his body. So it would be more consistent that Mr. Schliegelmeyer's description of the accident is more consistent with the types of injury patterns and the types of damage to the vehicle than Mr. Drury's.
Q. And, Mr. Cababa, you're going to tell this Jury if Mr. Drury was sitting up here and all of a sudden as he made a turn, he pitched like this (indicating) and he rolled completely over, where would his right leg be if he was still underneath the vehicle right now? If he's making this roll, where would his right leg be?
A. Hooked on the foot peg is what he said.
. . . .
Q. And if it continued to roll, then what would happen?
A. Then it would be exposed to the ground.
Q. And he could hurt his leg, couldn't he?
A. Yes. But the rest of his bodyYou would have to explain why the rest of his body doesn't get hurt on the lefton the first roll. I don't know how you can mysteriously sit on this vehicle and have it go this way at 30 miles an hour such that he can escape all sorts of injuries to the left side of his body and then all of a sudden miraculously come back over and get only a right knee injury. It's just not possible."
On redirect, Cababa was asked:
"Q. As an expert in accident reconstruction if in fact Mr. Drury is riding, as he says, and made a turn and started to tumble and went 360 degrees over, and maybe over again, is it possible for that ATC to have come out of that accident with no damage to it other than a scratch on the paint?
A. At 30 miles an hour?
Q. At 30 miles an hour.
A. No.
Q. Okay. Is it possible for Mr. Drury to have ridden this ATC, made a turn to the right, be sitting on the ATC, have it roll over, and Mr. Edwards says assume his leg here is up in the air, or maybe his right leg up in the air near the foot peg, in this position where is Mr. Drury's body and head and shoulders?
A. Well, it's close to the ground.
Q. It's hitting the ground, isn't it?
A. It's very close to the ground.
Q. And the vehicle's on it, isn't it?
A. Yes.
Q. So the 350-pound vehicle is on this man on the ground and it rolls again and he's back up and then it rolls again. Is that possible, that that accident scenario could happen as Mr. Drury describes, and he gets up and he walks over and he rides his ATC to the truck, puts it in the truck and goes home without going to the hospital? Can you get away with that kind of limited physical injury?
A. At 30 miles an hour?
Q. Yes. Can you get away with it?
A. No."
The jury found that the Honda ATC was not "defective, i.e., unreasonably dangerous in foreseeable use at the time of the accident." The trial judge apparently found otherwise. In order to affirm the JNOV, we must determine that the facts and inferences point so strongly and overwhelmingly to the conclusion that the Honda ATC was unreasonably dangerous in its foreseeable use that reasonable persons could not arrive at a contrary verdict, and in doing so, we must make no credibility evaluations.
"In order to prevail in a products liability action a plaintiff must prove that his damage was a result of a condition of the product which made the product unreasonably dangerous to normal use. The "normal use" of a product encompasses all intended or foreseeable uses and misuses of the product. A manufacturer is obliged to adequately warn the user of any danger inherent in the normal use of the product which is not within the knowledge of or obvious to the normal user. The manufacturer is also required to anticipate the environment in which the product will be used and to notify the user of the potential *771 risks arising from foreseeable use or misuse in the foreseeable environment."
Johnson v. Chicago Pneumatic Tool Co., 607 So.2d 615, 617 (La.App. 1st Cir.), writ denied, 608 So.2d 1009 (La.1992) (Citations omitted). Whether the Honda 250-R ATC was defective in construction or composition or design is a jury issue determinable by the evidence presented. See Halphen v. Johns-Manville Sales Corp., 484 So.2d 110 (La. 1986).[1]
Without making any credibility determinations and resolving any inferences and factual questions in favor of defendant, as required in considering a motion for a JNOV, the jury could have drawn the following inferences and conclusions:
a) The jury could have inferred that plaintiff, twenty-five years old at the time of the accident, was an experienced ATV rider who owned three ATVs at the time of the accident, had raced ATVs at local tracks and was capable of handling this ATC. Prior to this accident, the warnings and safety instructions and rider training which were later required by the Consent Decree were obvious and well known to an experienced rider such as plaintiff. Further, were three-wheel ATVs defective or unreasonably hazardous in foreseeable use, the CPSC would have recalled them.
b) From the Notice to Terminate Rulemaking the jury could have inferred that the CPSA had authority to recall three-wheel ATVs in an extrajudicial proceeding and the fact that the CPSC stated that it did not do so because it was not in the public interest reflects that the CPSC obviously found three-wheelers were not defective.
c) From the testimony of plaintiff, Schliegelmeyer, Johnson, and Nelson, the jury could have inferred that the throttle was not defective. Plaintiff was able to ride the ATC to the truck after the accident, he never mentioned a throttle problem to Schliegelmeyer, and there was no testimony by anyone, including Johnson, that the alleged faulty throttle or its component part, the carburetor spring, was ever inspected and found to be defective. There was no evidence, other than plaintiff's belated memory of the faulty throttle.
d) From Nelson's testimony, the jury could have also inferred that even though the throttle may have "stuck," it did not go any faster than originally set or pushed by plaintiff.
e) From the testimony of Kitzes, Glynn and McCarthy, the jury could have inferred that a comparative risk analysis using data from motorized recreational vehicles is the appropriate method to determine the risk of injury in ATV use. When such an analysis is made, the risk of injury and fatality is within the range of comparable recreational vehicles such as snowmobiles and mini-trail bikes; thus the risk was reasonable. It could have also concluded that there is no statistically significant relationship between the injury risk and Kst values; thus, the ATC is not defective.
f) From Dorris' testimony the jury could have concluded that the information and warnings contained in the manual are appropriate for the 250-R; the promotion and advertisement of the 250-R was aimed at encouraging the purchase and use of a high quality, high performance vehicle; and Honda was not trying to make racers out of their purchasers.
g) From Banks' testimony the jury could have inferred that the 1981 250-R was a good all-round sport vehicle which handles well and, it would require modifications to race it.
h) From Cababa's testimony the jury could have concluded that the accident was not the result of a turn but of Drury simply running over the ATV he was behind.
The cases of Laing v. American Honda Motor Co., Inc., 628 So.2d 196 (La.App. 2d Cir.1993), writ denied, 94-0375 (La. 3/25/94); 635 So.2d 239, and Antley v. Yamaha Motor Corp., U.S.A., 539 So.2d 696 (La.App. 3d Cir.1989), are distinguishable from this case. In Laing v. American Honda Motor Co., Inc., 628 So.2d 196, which involved an injury associated with a Honda ATC 250 in farm *772 use, the jury found the accident was caused by the lateral instability of the ATC. Defendants moved for a JNOV. The trial court denied the motion. In reviewing the denial of the JNOV on the causation issue, the trial court stated:
"The jury's conclusion that the ATV was unreasonably dangerous because its risk outweighed its utility was supported by legitimate and substantial evidence. If a vehicle, designed for heavy farm use and being driven normally, cannot avoid or withstand a mound of dirt in a turn row without the risk of serious injury to its rider, a reasonable jury could conclude that the vehicle failed the test set forth in Halphen. On appeal, Honda does not dispute the jury's finding of a defect but claims that the defect, lateral instability, was not the cause of the accident.... The verdict was supported by legitimate and substantial evidence. A valid line of reasoning and permissible inferences, as expressed by plaintiffs' experts, allowed the determination that Laing was traveling at a reasonable speed and that the instability of the ATV was the cause-in-fact of the accident. That Laing was an experienced ATV rider, was not wearing a helmet and may have been riding at dusk without lights was considered by the jury in assessing Laing with 25% fault."
Id. at 202.
In Antley v. Yamaha, 539 So.2d at 703, the reviewing court concluded that the jury was not manifestly erroneous in finding that the Yamaha 225 ATV was unreasonably dangerous per se when being ridden by a seven year old child; the record clearly reflected that the ATV was unreasonably dangerous to small children; and the jury could have reasonably concluded that the ATV was an unreasonably dangerous product due to the manufacturer's failure to adequately warn about a danger in its normal use by young children.
In both cases the issue of defectiveness of the particular ATV was presented to the jury and the jury determined the vehicle defective. The jury reached the opposite conclusion with the vehicle involved here and under the facts and circumstances peculiar to this case.
Interpreting the facts and inferences in favor of defendant as required in considering a motion for a JNOV, and making no credibility determinations, a jury verdict in favor of defendant is sustainable. Accordingly, the JNOV is set aside and the jury verdict reinstated.

NEW TRIAL
The trial court conditionally granted a new trial. La.C.C.P. art. 1811(C)(2). A new trial shall be granted, upon contradictory motion where (1) the verdict or judgment is contrary to the law and evidence; (2) important evidence is obtained after trial; and (3) the jury was either bribed or behaved improperly. La.C.C.P. art. 1972. Pursuant to La.C.C.P. art. 1973, a new trial may be granted if there is good ground therefor except as otherwise provided by law.
The standard for granting a new trial pursuant to La.C.C.P. art. 1973 was set forth by the supreme court in Lamb v. Lamb, 430 So.2d 51, 53 (La.1983), as follows:
"A proper application of this article necessitates an examination of the facts and circumstances of the individual case. When the trial judge is convinced by his examination of the facts that the judgment would result in a miscarriage of justice, a new trial should be ordered.... We have recognized that the court has much discretion regarding this determination. However, this court will not hesitate to set aside the ruling of the trial judge in a case of manifest abuse."
The trial judge's reasons for granting the new trial are:
"The Court followed the trial of this case very closely. Court personnel and jury were put through nine grueling days. The condition of the Court's docket simply does not allow sufficient time for the proper trial of a case such as this. The Court in its effort to conclude this trial within the limited time available, may have pushed the jury too hard.
The jury reached its decision in this extremely long and complicated case after *773 only one hour of deliberation. There is no possible way that total and complete consideration of all the evidence could have been given in this short time. Further, the jury wrongly discussed the evidence before they began deliberations or they did not discuss it al [sic] all and voted based on their emotions against the plaintiff. The factors that the Court feels may have improperly influenced the jury, were plaintiff's angry outburst in the courtroom during closing arguments, which was probably caused by counsel for Honda who during closing arguments made several unflattering remarks about plaintiff and by the questionable testimony of both Mrs. Fields and Jerry Wagnon. Jerry Wagnon, a wildlife agent testifying in full uniform, dramatically told the jury how plaintiff had beat him and broken his neck. Medical records produced in the Motion for JNOV showed that not only [sic] was his neck not broken but the doctor found only a few abrasions. Mrs. Fields not only testified that she had seen plaintiff frequently riding his 250-R machine but broke down in tears in front of the jury. The record showed, through Honda's own photos that the machine had been completely dismantled years before [sic] Mrs. Fields had even moved to Tangipahoa Parish. Lastly, and perhaps [sic] most damaging, counsel for Honda stood between plaintiff and Mrs. Fields and told the jury that he was doing so to block Mrs. Fields' view of plaintiff because she was terrified of him. Mrs. Fields outburst of tears and emotion destroyed any hope of plaintiff's counsel effectively cross examining her. The plaintiff was painted throughout the course of this trial as a very violent, dangerous individual. This together with his outburst in court caused the jury to fear for its safety and made proper consideration of the evidence nearly impossible. The above stated factors had absolutely nothing to do with the merits of plaintiff's case, which should be decided strictly on the evidence and nothing else.
The Court does not believe that the jury, because of the conditions created during the course of the trial, could give this case the consideration it deserved and accordingly feels that plaintiff would be entitled to a new trial."
The trial judge's reasons reflect that he was granting a new trial pursuant to La.C.C.P. art. 1973 and possibly 1972(2) and (3). In a motion for new trial under either La.C.C.P. art. 1972 or 1973, the trial judge may evaluate the evidence without favoring either party; he may draw his own inferences and conclusions; and evaluate witness credibility to determine whether the jury had erred in giving too much credence to an unreliable witness. Smith v. American Indemnity Insurance Co., 598 So.2d 486 (La. App. 2d Cir.), writ denied, 600 So.2d 685 (La.1992). The standard of appellate review is whether there was an abuse of discretion by the trial judge. Anthony v. Davis Lumber, 629 So.2d 329 (La.1993); Pellerin v. Tudor Construction Co., 414 So.2d 403 (La. App. 1st Cir.1982), writ denied, 420 So.2d 455 (La.1982).
The length of jury deliberation is not indicative of jury misconduct. Laborde v. Velsicol Chemical Corp., 474 So.2d 1320 (La. App. 3rd Cir.1985), writs denied, 480 So.2d 738 (La.1986). Consequently, the trial judge's indication that there might have been jury misconduct under La.C.C.P. art. 1972(3) because of the short deliberation is insupportable.
We have carefully reviewed the record of this nine day trial, including those instances mentioned by the trial judge in his reasons for granting the new trial to determine whether the trial judge abused his discretion in granting a new trial under La.C.C.P. arts. 1972 and 1973. We conclude that a new trial should not have been granted.
The testimony of Jerome Wagnon referred to by the trial court reflects that subsequent to plaintiff's accident, plaintiff had the strength to use his right leg to kick the witness during a fight. Wagnon also testified that plaintiff broke Wagnon's neck by dislocating Wagnon's hyoid bone by two centimeters. He added that this dislocation was subsequently diagnosed by a CAT scan performed at Ochsner Hospital.
Mrs. Myrtis Smith Fields is a 74 year old neighbor of plaintiff. At the beginning of *774 her testimony, plaintiff's counsel objected to defense counsel standing behind him while defense counsel questioned the witness.
"MR. EDWARDS:
I object to Mr. Williams standing right behind my head questioning the witness.
MR. WILLIAMS:
Judge, Mr. Drury hasn't been here all day and he comes in here and puts a bead eye on a 73-year old lady. I'm standing here
MR. EDWARDS:
He's not putting a bead eye on anybody.
MR. DUPLASS:
Yes, he is, Judge. Look at the man.
MR. WILLIAMS:
He hasn't been here all week. And all I'm doing is standing right here. I'm not bothering anybody. I'm not doing anything.
MR. DUPLASS:
He hadn't been here one day and here he comes for the only witness he comes to trial for and he sits right there looking at this poor woman.
THE COURT:
Mr. Duplass, really.
MR. DUPLASS:
Judge, we're sitting here watching the man. And I still don't think this is funny.
THE COURT:
All right.
MR. EDWARDS:
Would you ask Mr. Williams not to stand behind me and look over my shoulder, please?
MR. WILLIAMS:
I'm just asking my questions. We've been roaming all around the courtroom all along."
The week before trial plaintiff apparently called her a "dirty old m.f" and said he was going to get her. She calls in complaints to the sheriff's office on a weekly basis about most of her neighbors, including plaintiff, for "raising too much dust" on the road in front of her house, etc. She also has an on going boundary dispute with a neighbor. She repeatedly photographs all of her neighbors for "evidence" about many things. She also had a photo of plaintiff riding an ATV taken since the accident. Upon cross-examination by plaintiff's counsel, she apparently became upset. A juror requested that the court let her take a break. Plaintiff's counsel said he had no problem with that. After a short break cross-examination resumed.
During closing arguments, defense counsel stated he was personally offended by things that occurred during trial including plaintiff who "asks for $6 million and doesn't even take the time to sit through the trial with us.... He didn't even have the courtesy to come in here and sit with us through this trial...." Drury burst out "Your Honor, tell him don't be pointing at me no moreI don't want him pointing his finger at me no more." The trial judge then ordered plaintiff escorted from the courtroom.
The instances pointed out by the trial court for granting a new trial were minor occurrences and in the total picture could not have considerably influenced the verdict against plaintiff. The more likely influences were the numerous inconsistencies of plaintiff's testimony, plaintiff's deliberate withholding and misstatement of medical information, and his varying versions of how the accident happened, which were not detailed in this opinion.
We conclude that the trial judge abused his discretion in granting the new trial. Accordingly, we reverse the granting of a new trial.

MANIFEST ERROR REVIEW
We have determined that the motion for JNOV was erroneously granted by the trial judge, and we have reinstated the jury verdict. We have further determined that the trial court erroneously granted a new trial. Consequently, the jury verdict is now the judgment before this court. Due to the stringency of the requirements for granting a JNOV, it is theoretically possible for a JNOV to be inappropriate, and the jury verdict to still be manifestly erroneous. However, we do not find that to be the situation here.
Unless the jury findings are manifestly erroneous or clearly wrong, those findings cannot be disturbed on appeal. Stobart v. State Through DOTD, 617 So.2d 880 (La. 1993); Rosell v. ESCO, 549 So.2d 840 (La. *775 1989). "Where there are two permissible views of the evidence the factfinder's choice between them cannot be manifestly erroneous or clearly wrong". Rosell, 549 So.2d at 844.
The evidence presented to the jury in this case was a mixture of lay fact witnesses and expert testimony.
"Where the testimony of expert witnesses differ, it is the responsibility of the trier of fact to determine which evidence is the most credible. (Citations omitted). Consequently, on appellate review the trial court's reasonable factual findings, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed."
Sistler v. Liberty Mut. Ins. Co., 558 So.2d 1106, 1111 (La.1990).
After reviewing the entire record, we conclude that the jury findings were not legally incorrect and were not manifestly erroneous or clearly wrong. Consequently, we affirm the jury verdict.

DECREE
The judgment of the trial court granting a motion for JNOV and the JNOV is reversed. The jury verdict is reinstated and a new trial is denied. The verdict of the jury is affirmed.
Appellee is to pay all costs.
REVERSED AND RENDERED.
NOTES
[1] The Halphen analysis is applicable to this case which arose prior to the enactment of La.R.S. 9:2800.51 et seq. Gilboy v. American Tobacco Co., 582 So.2d 1263 (La.1991).